[L. A. No. 4983.   In Bank.—January 31, 1921.]

## FRANK M. SALISBURY, Respondent, v. EDWIN YAWGER et al., Appellants.

[1] AGENCY—SALE OF LAND—CONTRACT FOR PURCHASE—ENFORCEMENT BY AGENT IN OWN BEHALF.—An agent employed to make a sale of land is not entitled to enforce performance of a contract for its purchase on his own behalf, where the owner was led to believe that the uncle of the agent was the purchaser and the correspondence between the agent and the owner disclosed that the agent claimed full commission for making the sale.

[2] ID.—EXECUTION OF DEEDS TO AGENT—KNOWLEDGE OF PURCHASE—INSUFFICIENT EVIDENCE.—The mere circumstance that an agent employed to sell land directed the deeds to be executed to himself and wife and that the owner acquiesced therein was not such notice of the circumstance that the agent was purchasing the land for himself, as would validate such a purchase.

[3] SPECIFIC PERFORMANCE — CONTRACT FOR SALE OF LAND — PLEADING AND EVIDENCE—VARIANCE.—Where an agent in an action for the specific performance of a contract for the sale of land alleged that the contract was between himself and two of the defendants, and the contract proved was one between one of such defendants and plaintiff's uncle, or, accepting plaintiff's view, between such defendant and the plaintiff, he failed to prove the contract alleged.

[4] ID.—PLEADING—JUSTNESS AND REASONABLENESS OF CONTRACT—INSUFFICIENT COMPLAINT.—A complaint in an action for the specific performance of a contract for the sale of land is insufficient where it merely contains the allegation that the contract is just and reasonable, but contains no allegation as to the value of the land or other circumstances showing that the contract is just and reasonable or that the consideration is adequate.

[5] APPEAL—MOTION TO DISMISS—LACK OF VALID NOTICE—ADMISSION OF RESPONDENT'S ATTORNEY.—On a motion to dismiss an appeal on the ground that no valid notice of appeal had been filed, an admission by respondent's attorney in a letter to the appellant's attorney before the time for appeal had expired that a notice of appeal had been served upon him is evidence that the appeal was properly taken, and sufficient to sustain the appeal.

[6] ID.—DISMISSAL BY DISTRICT COURT OF APPEAL — LACK OF VALID NOTICE — POINT NOT RAISED BY PARTIES — HEARING IN SUPREME COURT—REVIEW OF EVIDENCE.—Where the district court of appeal

---

1. Right of broker to commissions where he becomes purchaser, notes, **Ann. Cas.** 1912A, 202; 31 L. R. A. (N. S.) 536.

of its own motion, without suggestion of either of the parties, dismissed an appeal on the ground that no valid notice of appeal had been filed, the supreme court, upon a hearing of the appeal after transfer for further consideration, will not be disposed to be critical of the evidence produced in support of the appeal.

APPEAL from a judgment of the Superior Court of Imperial County. Franklin J. Cole, Judge. Reversed.

The facts are stated in the opinion of the court.

Allen E. Rogers and R. C. Springer for Appellants.

R. D. McPherrin, Nichols & McPherrin and Conkling & Brown for Respondent.

THE COURT.—Plaintiff brought this action to obtain the specific performance of a contract for the sale of 160 acres of land, 80 acres of which stands of record in the name of Edwin Yawger and 80 acres in the name of Altie S. Yawger, the defendants and appellants, and to compel the delivery of deeds, mortgages, and stock certificates held in escrow by the defendant Southern Trust and Savings Bank of San Diego. The record on appeal is prepared under section 953a of the Code of Civil Procedure. For sake of brevity, Edwin Yawger will be referred to as "the appellant" and the Southern Trust and Savings Bank of San Diego as the "Trust Company," or the "escrow-holder." On October 19, 1914, appellant signed a written contract of employment wherein he appointed respondent, doing business under the name of the Salisbury Realty Company, as sole agent for sixty days from date for the sale of the 160 acres above referred to and agreed to pay a regular commission of five per cent on the price. The terms of payment therein stated were one thousand dollars cash, balance five thousand five hundred dollars in five years and five thousand five hundred dollars in eight years, at seven per cent interest, payable semi-annually, possession to be given July, 1915. December 2, 1914, the respondent mailed to appellant a check for $50 deposit on the 160 acres, stating that "the $450 is ready for you as soon as your final certificate comes, at which time we will close the deal and draw up the notes, mortgage, and transfer the water stock, etc. The balance of the $1000 we will fix up on the first of March if that is satisfactory with

you . . . regarding possession of the ranch we can talk that over at some future date." On December 5, 1914, appellant wrote two letters to the respondent, in the first of which he states: "I am enclosing herewith my formal acceptance of your deposit. I have only the preliminary receipts from the land office. . . . The numbers of these entries are Altie S. Yawger 018689—Edwin Yawger 01126 (E Y's former number 0778). I will be glad to learn more of the particulars of the sale. . . . Hoping to hear from you further and congratulating you on your success, I am, etc." The formal acceptance above referred to is in part as follows: "Your favor of the 2nd inst. enclosing check for $50.00 is at hand. I am accepting this deposit on the understanding that you have contracted for the sale of the described property for not less than $12,000.00, $500 to be paid on execution of the transfer, $500 to be paid on March 1st, 1915, $5,500 to be paid in not less than five years after date of transfer, $5,500 to be paid in not less than eight years after date of transfer. Interest on deferred payments to be paid semi-annually at the rate of 7 per cent per annum. While I cannot at this writing, guarantee the date of purchasers possession earlier than July 1st, 1915, I will use my good offices in meeting his desires in this particular." In view of the contention of the appellant that the relation between appellant and respondent at all times was that of agent and principal, it will be observed that up to this point in the correspondence the appellant is apparently accepting a proposal made to his agent, the plaintiff. In the reply of December 14th the respondent restates the terms of sale in accordance with the letter of appellant, and discloses the fact that respondent's uncle in Oklahoma was the purchaser of the ranch. The language is as follows: "Among others who I put the proposition up to in the past month or so, I wrote to my uncle in Oklahoma, who I have been trying to get interested in the valley for several years. I gave him full particulars and told him he had better buy a ranch before he arrived here. If he didn't feel like handling it all I told him I would, go in with him on it. He has a large income every month and I have been trying to get him to invest part of it here. A few days before I wrote you I received a letter from him to go ahead on it. . . . I will probably hear further from my uncle in a

few days regarding his ideas of handling the place." It will be observed that this is the first intimation in the correspondence that the agent might become or was interested in the proposition. And the extent of this information is that he had informed his uncle that he would go in with him on it if the uncle did not feel like handling the whole thing. There is no statement, however, that the uncle was unable or unwilling to carry out the contract which the nephew was executing on his behalf. The next letter is January 15, 1915, in which respondent notifies appellant as follows: "Have had a couple of telegrams from my uncle and he will be unable to reach here before the last of the month, so I will not keep you waiting on his arrival. Shall I make the notes and mortgage here, or will you have them drawn up and sent over to be signed? . . . If you want to draw them up there make them read Frank M. Salisbury and Mary E. Salisbury, and send them over and we will get the deal closed up." On January 21st appellant notified respondent that the letter had been mislaid, requesting a copy. In reply the respondent notified the appellant as follows: "You can make the papers out to Frank M. and Mary E. Salisbury. If you will have the Mtg. & notes made out the way you want them & send them over we will send them with the money to the Southern Trust & Savings Bank. The deed you can turn in to the bank there. We can close it up at any time. If you would rather wait until my uncle gets here and see if he will make a larger cash payment it will be all right with me. Has the water stock been transferred yet?" It will be observed that this proposition, in the light of the former correspondence, amounted to the proposal of an arrangement by which the respondent would take the title in himself and his wife for and on behalf of the uncle, hence the proposal that if the appellant desired he could wait until the uncle gets here. On January 29th the appellant wrote the respondent that he had placed in escrow with the Trust Company the deeds, water stock, notes, and mortgages, and stated, among other things, as follows: "I understand the customary commission in this state is 5% on the 1st $5000 and 2½% on the balance. This would figure $400. . . . As it is now nearing the 1st of March I think it would simplify matters if you would complete the 1st payment of $1,000 between now and Mar.

1st at which time the bank would turn over to you the
deeds, the water stock, the title guarantee and the note for
$400 without interest.  Receiving from you the notes, the
mortgage and your check for $950.00.''  This proposition of
the appellant was, in effect, to allow a commission of four
hundred dollars, which was to be paid by surrendering the
note of the respondent for four hundred dollars, which,
apparently, had resulted from some previous dealing be-
tween the parties.  On February 1st appellant wrote re-
spondent stating that the stock should be handled a little
differently, owing to the small amount of the first payment.
''We will assign the stock to you and instruct the bank to
hold the same in escrow in your name until payment is made
on the first note [$5,000] when the stock is to be delivered
to you or your assign.''  It will be observed that this pro-
posal called upon the respondent to wait five years before
he received possession of the stock certificates.  On February
9, 1915, appellant writes respondent that he wishes to know
''whether we are in agreement on the details of the transfer
of the No. 5 highline property,'' and asks, ''Can you not
write me at once giving me your decision on the points
outlined in my letters of Jan. 29 and Feb. 1?''  On Feb-
ruary 12th a letter was written on behalf of the respond-
ent by Elta B. Turbett containing the following statement:
''The way he understood the deal was $12,000 for the ranch.
The regular commission for selling land in Imperial Valley
is 5% straight, and the contract you signed on it you
agreed to pay 5%.  That would make $600 commission
or a balance due on the first payment of $350.00.  But Mr.
Salisbury thought you would probably want a little more
cash, as the first payment was small, so made the proposi-
tion to pay $500 cash and then deduct the $100 balance of
commission when the horse note was paid.''  It will be
observed that this answer does not meet the proposal of
the appellant, who is asking for $950 cash by March 1st.
The counter-proposal is to pay five hundred dollars cash
and no more, the six hundred dollars commission taking care
of the other five hundred dollars and extra one hundred dol-
lars thus paid by plaintiff was to be deducted from the
''horse note,'' which, apparently, was the four hundred dol-
lar note.  On February 25th respondent sent the Trust Com-
pany notes and mortgage executed by himself and wife for

eleven thousand dollars and a check for $450, "balance of first payment on said land," with instructions to turn them over to appellant on the receipt from him of a "deed to me for said property, also a certificate for 150 shares of Imperial Water Company No. 5 stock *either* made out in my name or indorsed to me." On February 27th respondent sent a second letter to the Trust Company, stating that notes and mortgage were inclosed, and adding: "If there is anything else necessary on my part to close the deal, please let me know." On March 5th appellant wrote respondent, stating that he did not understand how he intended to handle the settlement of "our account." "When you forwarded $450 as first payment I supposed you would pay the note in the regular way, leaving a balance of $500 as your commission. I did not remember the wording of the commission clause in my original agreement with you, but supposed it would be in line with the rates charged in San Diego. However, if the agreement calls for 5% on the whole amount I will stand by it and you can either pay the note in full ($410) and I will hand you back check for $100, or you can have the note returned to the Southern Trust & Savings Bank together with your check for $310 and I will surrender the note along with the other papers. I understand that it is usual to surrender the water stock when same is used for collateral, and have a proper notation on same made by the Water Co." It appears from this proposition that the appellant was willing to accept a cash payment of five hundred dollars, to concede a commission of six hundred dollars, and to accept $310 in payment for a $410 note heretofore referred to, and expected to retain the certificates of stock as pledgee. The letter of appellant the next day urged respondent to complete the deal, and added: "I think as my agent you had better get 'Mr. Salisbury' to come across." On March 9th appellant again wrote respondent, "I regret that you did not grant me the courtesy of notifying me beforehand of your intentions in regard to the *payment of your note.* I gather from your letter and from your telephone conversation that part of your hesitation is due to alleged defects in the horses, and on this assumption I feel warranted in taking whatever measures are in my power for my protection." On March 26th, 1915, appellant notified the Trust Company that they had posses-

sion of the two deeds in question; that "150 shares of water stock is in the hands of 'Imperial Title Guaranty and Bonded Abstract Company,' which they will have transferred to Mr. Salisbury with myself as pledgee, as soon as the March 10, 1915, water assessment is paid." The assessment amounted to $90.71. "I understand you now have from Mr. Salisbury the sum of $450 in cash; one promissory note for 5 years at 7% payable semi-annually; one promissory note for 8 years with interest at 7%, payable semi-annually; notes secured by mortgage on the property, all dated Jan. 1st, 1915. . . . I therefore request that you turn over to me the cash and papers above referred to, reserving an amount sufficient to cover the back taxes, which in my opinion will not exceed $100.00." This was not done. On April 14th respondent wrote the Trust Company directing them to close the deal in accordance with the letter of *February 25th*. This letter, as above stated, requires "a certificate for 150 shares of Imperial Water Company No. 5 stock either made out in my name or endorsed to me" to be delivered to the escrow holder. But the letter of April 14th contained the following modification: "You can take an order from Mr. Yawger, also from Altie S. Yawger if it seems necessary to the Abstract Company or the parties holding the stock, *instructing them to transfer the stock to me as soon as I have paid the assessment*, so that the stock is transferable on the companies' books. Please also get from Mr. Yawger an agreement whereby he will agree to pay all taxes which may be assessed to said property covering the period up to January 1st, 1915, when due." It will be observed that according to respondent's letter of April 14th the water stock was to be assigned to him and left with the abstract company until he had paid an assessment on the stock, which, it appears, amounted to $90.71, and that thereafter it was to be transferred to him, while the proposals of the appellant were that the stock should be issued to appellant as pledgee of respondent and that the certificates should remain with the bank for five years. At this point it will be seen that up to April 14, 1915, there had never been a complete meeting of minds between the appellant and the respondent for the following reasons:

First, the respondent had never informed the appellant that he was purchasing for himself and not for his uncle.

Second, appellant was insisting that his four hundred dollar note be paid as a part of the transaction, which increased the amount of the cash payment $310.

Third, the proposition of the appellant that the stock should be reissued in the name of appellant, as pledgee, and retained in the possession of the escrow-holder, was never accepted, and counter-proposals were made and pending on April 14, 1915.

Fourth, the parties had agreed on the payment of $90 water assessment by respondent, but the appellant had not consented to a postponement of the transfer of the stock, due to respondent's delay in paying the assessment, if any.

Fifth, the date fixed in the proposals of the appellant for the payment of the $310 had expired on March 1, 1915, and no other arrangement had been made for such payment.

[1] If we assume, as respondent contends, that he was not acting as agent but in his own behalf, there was no meeting of minds, for the reasons stated, and, hence, no contract. But the correspondence makes it clear not only that the respondent was appellant's agent for the sale of the land, but also that he claimed to have effected a sale as such agent and was claiming full commission therefor. [2] The mere circumstance that respondent directed the deeds to be executed to himself and wife and that appellant acquiesced therein is not such notice of the circumstances as would validate a purchase by the agent himself. (*Burke* v. *Bours,* 92 Cal. 108, [28 Pac. 57]; S. C., 98 Cal. 171, [32 Pac. 890].) Moreover, appellant in the letter of March 6, 1915, had informed respondent that he had received a better offer for the ranch which would make him "come out one thousand four hundred dollars ahead," thus indicating that at that date he was only continuing negotiations because of his belief that a sale had been made to the uncle. It remains to consider whether the subsequent dealings between the parties constituted a contract. On April 19, 1915, the first symptoms of trouble appeared. On that date appellant notified Salisbury as follows: "In view of the fact that C. P. Vandenberg who I understand to be the purchaser for my ranch has defaulted in one of the two payments of $500 due respectively on date of execution of the transfer and on March 1st, 1915, I feel that I have the right to cancel the negotiation and shall be obliged to do so unless

you deposit for escrow within five days the additional sum
of $500 in the Southern Trust & Savings Bank of San
Diego notifying me at Brawley of your action.'' On April
24th plaintiff wired five hundred dollars to the Trust Com-
pany and telegraphed appellant as follows: ''Have deposited
five hundred dollars with Southern Trust & Savings Bank,
San Diego, as per your letter of nineteenth, and paid assess-
ment on stock.'' On the same date plaintiff wired the Trust
Company that he had made the deposit in response to a
demand of Yawger and stated: ''This in direct violation
of his oral agreement here, but I am complying to protect
escrow. Please be advised I will require you protect my
interests in this escrow as no default made by me.'' On
the same date appellant wrote the Trust Company as fol-
lows: ''I presume the deed, etc. will have to be made out
to another party, and until this is determined I suggest you
hold my part of the escrow subject to my order.'' We
will pause in the statement of facts to say that the trial court
found that the contract for sale of the land and water stock
was entered into December 5, 1914, between respondent and
Edwin Yawger and Altie S. Yawger, in accordance with
the allegation of the complaint to that effect, although this
allegation was amended by stipulation at the time of the
trial so as to substitute the date October 19, 1914, as the date
of the contract, which is the date of the contract of em-
ployment above mentioned. The court further found that
the escrow was fully completed on April 24, 1915, and that
thereupon the title of the land and water stock passed to
respondent, and the right to the money vested in Edwin
Yawger and Altie S. Yawger. The court found as a fact
and decreed in accordance with the finding that the plaintiff
was the owner of the land in fee, and in the same decree
directed the delivery of the above-mentioned conveyance
by the escrow-holder wherein the respondent and Mary E.
Salisbury were grantees. The significance of these conclu-
sions will appear from the fact that on May 7, 1915, while
the money was still in the possession of the escrow-holder, a
writ of execution issued upon a judgment in favor of W.
W. Wilkins and against the plaintiff was levied upon all the
money ($950) and stock of respondent in the hands of the
escrow-holder. Thereafter, on the same day, appellant de-
manded of the escrow-holder the return to him of the deeds

and certificate of title, owing to the fact that by reason of the levy of the execution the deal could not be carried out. On May 11th respondent telegraphed to the escrow-holder that the money in its hands was not subject to attachment. On May 22d appellant made another demand on the Trust Company for the delivery of the money deposited by F. M. Salisbury, "or the return of my papers to me," and stated: "I shall have to insist that *one or the* other be done within three days from the date of the receipt of this letter by you, as I cannot allow the matter to drag on indefinitely, believing it has already been allowed to drag beyond all reasonable time." On May 29th appellant notified respondent that he had demanded that the escrow-holder return all papers belonging to him and cancel proposed deal, and added: "I still hold your note for $400.00 and interest which is past due, and in addition my claim against you for conversion of my property. I also reserve the right to put forward a reasonable claim for damages in connection with your proposed purchase of my ranch in the event it appears such damages have been occasioned by your default." This letter was answered on June 7, 1915, by the respondent's attorneys, who stated that the last five hundred dollar payment had been made under their advice, and that thereupon "it was the duty of the bank and yourself to make and accept delivery of the funds and papers under the terms of the escrow instruction." After stating that the appellant had caused the attachment to be levied, the following is added: "While it is true that you hold Mr. Salisbury's note which is past due in the sum of $400.00, it is also true that you owe him $600.00 for commission for the sale of the property involved in the escrow; you also have a claim for damages or compensation for his mistaken use of your personal property. These latter matters, while not involved in the escrow transaction, we will be willing to discuss and adjust with you at any time and place."

From the foregoing it will be observed that the nearest approach to an agreement was reached on the 24th of April, at which time the respondent acceded to the demand of the appellant that the sum of five hundred dollars in addition be paid to the escrow-holder. Up to that time the parties had been dealing on the theory that a commission was to be allowed and arranged in the deal itself and while, as

already stated, the details thereof had not been fully arranged, the new demand of appellant for the deposit of five hundred dollars was based upon the assertion of appellant that the transaction was one between appellant and C. P. Vandenberg. The immediate compliance with this demand was an acknowledgment by plaintiff that Vandenberg was the purchaser and that the contract was one between appellant and C. P. Vandenberg. So that if it can be said, as the trial court holds, that the minds of the parties met on April 24th and the deal was then fully consummated, the agreement was between the appellant and Vandenberg for the sale of the property. On such an agreement the plaintiff as the selling agent was entitled to the agreed commission, but, of course, was not entitled to enforce the contract on his own behalf (*Burke* v. *Bours, supra*). In passing it should be noted that the plaintiff alleged and the court found as a fact that the levy of the execution of May 7th was made at the instance of the appellant. It is claimed by the appellant in his brief that there was absolutely no evidence to support this finding and the respondent does not print any such evidence in his brief, and we may therefore conclude that no such evidence is contained in the record. However that may be, the fact of this levy under judgment against the plaintiff is an apt illustration of the difference between the contract the appellant made and the one which is sought to be enforced here. If the transaction was one between appellant and Vandenberg, an execution against Salisbury would have no effect. Furthermore, the sale was made largely on credit, and the responsibility of the purchaser was of vital moment. After deducting commissions only four hundred dollars was to be received by the owner for the transfer of land and water stock valued at twelve thousand dollars. Possession of the premises was to be delivered and the deferred payments were to be made in five and eight years.

[3] The respondent did not prove the contract he alleged. He alleged that the contract was between himself and the two appellants, Edwin and Altie Yawger, while the contract proved was one between Edwin Yawger and C. P. Vandenberg, or, accepting plaintiff's view, between Edwin Yawger and the plaintiff. Altie Yawger was not a party to the contract. The deposit of her deed merely placed

Edwin Yawger in a position where he could carry out his agreement to convey the entire 160 acres. The court found the fact in accordance with the allegation of the complaint.

Appellant contends that the wife, Mary Salisbury, should have been a party plaintiff and that the judgment creditor, Wilkins, and the sheriff should also be made parties. It is clear that Mary Salisbury should have been a party because the effect of the judgment is not only to direct a conveyance to her, but also the delivery of a mortgage executed by her for eleven thousand dollars. The respondent claims it is unnecessary to bring in the judgment creditor, for the reason that the levy of the execution was ineffectual and invalid because the title to the money had passed to appellant at the time of the levy of the execution, and for the further reason that the stock, although assigned to the respondent, was held in pledge and the rights of the appellant as pledgee had already attached and no tender of the amount of the pledge was made. It is clear that the judgment creditor should have been made a party. It does not appear, however, that any request of any kind was made of the court that such parties be brought in, and their absence does not invalidate the judgment. We may, therefore, consider the effect of the levy as between the parties before the court. The plaintiff's theory that the title to the money had passed to the defendant is erroneous, for the contract was never consummated. It follows that the plaintiff was in default because of a failure to comply with appellant's demand of May 22d for either the money or for a return of his deeds. No subsequent tender was made by plaintiff, and having also failed to release the money from the lien of the execution, plaintiff cannot prosecute this action. Appellant has not made his points clearly in his opening brief, but it sufficiently appears that he is claiming that there could be no contract between respondent, who was acting as agent, and the appellant, his principal, "without full knowledge of his principal, and such purchase will always be set aside at the option of the principal." (Citing *Burke* v. *Bours, supra,* and similar cases.) In his reply brief appellant, instead of flatly claiming that there was no contract of sale between appellant and respondent, analyzes the correspondence for the purpose of showing that there was no contract on October 19th or December 5th, and no ratifica-

tion.  However, the general drift of the claim is that there
was never a time when it could be said that the minds of
the parties had met, particularly in view of the respondent's
position as agent.  We make these observations to forestall
the usual claim in a petition for rehearing that the case
is decided on points not raised.

[4]  In the appellant's brief, filed in this court after
transfer from the district court of appeal, the point is made
that the complaint is insufficient for the reason that it
"does not contain facts showing that the contract is as
to the defendants just and reasonable; that their assent was
not obtained by misrepresentation, concealment, circumven-
tion, or unfair practices of the respondent, or by any prom-
ise of the respondent which has not been specifically fulfilled,
and that the assent of respondent was not given under the
influence of mistake, misapprehension, or surprise.  Appel-
lants also contend that no proof was offered nor any finding
made to the effect that the defendants received an adequate
consideration for the contract, if any contract there was."
This claim is based upon the provisions of section 3391 of
the Civil Code.  The complaint contains an allegation that
the contract is just and reasonable; but there is no allega-
tion as to the actual value of the land and no other cir-
cumstances alleged showing that it was just and reason-
able or that the consideration was adequate.  This is clearly
insufficient under the authorities cited by the appellant.
The facts showing that it was just and reasonable should
have been alleged.  (*White* v. *Sage,* 149 Cal. 613, [87 Pac.
193]; *Herzog* v. *Atchison etc. R. R. Co.,* 153 Cal. 496, [17
L. R. A. (N. S.) 428, 95 Pac. 898]; *Young* v. *Matthew
Turner Co.,* 168 Cal. 671, 675, [143 Pac. 1029].)  There is
no finding and no proof offered on the question of the ade-
quacy of the consideration.

[5]  This cause was transferred to the district court of
appeal of the second district for decision.  The court, of its
own motion, made an order dismissing the appeal on the
ground that no valid notice of appeal had been filed.  The
respondent had not made or presented any motion to dismiss
and the matter had not been suggested by either of the par-
ties.  The merits of the case had not been considered.  The
order of dismissal was set aside by the supreme court and
the cause transferred to this court for further consideration.

Within sixty days after the judgment in the superior court was entered the defendants filed in the office of the clerk of that court a notice which they intended as a notice of appeal. The only notice appearing in the record before us relating to an appeal is a notice appearing to have been drawn as a notice under section 953a of the Code of Civil Procedure. It was filed within sixty days after the judgment, but as a notice of appeal it was slightly defective in form. The record does not affirmatively show that no other notice purporting to be a notice of appeal was filed. Nor is there any proof that no such notice was filed. The papers filed in this court in opposition to the dismissal of the appeal show that the respondent's attorney, in a letter to the appellant's attorney before the time for appeal had expired, admitted that a notice of appeal had been served on him by the appellants. His conduct throughout the case prior to the decision by the district court of appeal dismissing the case indicates that he fully understood and believed that an appeal had been duly taken, and that if there was any defect in the form of the notice, he had waived it. Such admissions are evidence that the appeal was properly taken and are sufficient to sustain the appeal on a motion to dismiss. (*Merritt* v. *Los Angeles,* 162 Cal. 47, [120 Pac. 1064]; *Burnett* v. *Piercy,* 149 Cal. 178, 184, [86 Pac. 603].) [6] Where, as in this case, the parties originally submitted the case without raising the point and the question arises solely because of a suggestion from the appellate court, we are not disposed to be critical of the evidence produced in support of the appeal. We think the showing that the appeal was properly taken is sufficient.

The judgment is reversed.

Wilbur, J., Olney, J., Shaw, J., Sloane, J., Lawlor, J., and Angellotti, C. J., concurred.