[Civ. No. 996.  Fourth Appellate District.—November 18, 1932.]

HERMAN L. SILVER et al., Respondents, v. J. J. LOGUE et al., Appellants.

I. Henry Harris and Patrick F. Kirby for Appellants.

Thorwald Siegfried and Rose Hemperly for Respondents.

BARNARD, P. J.—This is an action to set aside a sale of certain real property upon the ground that the defendants, while pretending to act as agents of the plaintiffs in the sale thereof to a third person, in fact purchased the same themselves without disclosing the real facts to their

principals. The defendant Maude B. Logue was the step-mother of the plaintiff Edith J. Silver and for some years considerable intimacy had existed between the two families. The two defendants, as partners, were engaged in the business of real estate brokers. At the same time, the defendant J. J. Logue was vice-president of, and employed as a bookkeeper by, a corporation known as "United Fashion Stores, Inc.," in which corporation Maude B. Logue was a stockholder.

In July, 1925, Mrs. Silver was the owner of a house and lot in Pacific Grove, California. At her request the defendants undertook to try to find a purchaser for this property, with the understanding that they were to be paid a commission if they succeeded. A little later the defendants reported to the plaintiffs that they were unable to find a purchaser for the property for cash, but that they had found a purchaser who would give them $2,500 worth of stock in the above-named corporation for the house; that this purchaser was a woman with a son; that she did not have the cash but wanted a home; and that she was loath to part with this valuable stock and would do so only on the condition that the defendants would guarantee to later replace the stock for her. The defendants also stated that they knew this was a prosperous corporation; that it was doing a splendid business and would be a wonderful investment; and that they were both in a position to know just what was going on in the business. The plaintiffs agreed to exchange their property for this stock in the corporation and at the request of Mrs. Logue, they deeded the property to her in order that she might deed it to the prospective purchaser. The plaintiffs received for the property 40 shares of preferred and 20 shares of common stock in the corporation, taking the same at a price of $125 for each unit of two shares of preferred and one share of common.

About a year later, the defendants secured from the plaintiffs a quitclaim deed to the property, telling them it had been sold and that a mistake had been discovered in the description in the original deed. Some two months later an assessment was levied on the stock of the corporation, which was paid by the plaintiffs, and very shortly thereafter the corporation went into bankruptcy and its stock became worthless. Nearly two years later, the plaintiffs discovered

for the first time that the defendants had themselves purchased the property instead of selling it to a third person, and that the shares of stock received for the property were a part of the stock previously owned by Maude B. Logue. In the meantime the defendants had sold the real property in question for $3,000, receiving $300 in cash and taking back a mortgage of $2,700 payable in monthly installments. The plaintiffs made a written offer to the defendants to return the stock received and demanded the return of all the defendants had received, which offer and demand were refused by the defendants. In this action which followed the plaintiffs sought to establish that the defendants were holding all they had received through the transaction in trust for the plaintiffs, and asked for an accounting and the return of all the money or property received. At the trial, the stock which had been transferred to the plaintiffs was tendered to the defendants and deposited in court for them. The trial court found in favor of the plaintiffs on all disputed points and entered judgment accordingly, from which judgment the defendants have appealed.

Appellants' principal contention is that the essential findings are not supported by the evidence. As stated by them, the only questions arising from the disputed issues of fact are, first, whether Mrs. Logue pretended to be acting as agent instead of as principal in purchasing this real property and whether the Silvers had actual knowledge that she was buying the property for herself; and second, whether, assuming that the Silvers did not have such actual knowledge at the time of the sale, they acquired such knowledge and ratified the sale at the time of giving the subsequent quitclaim deed. While appellants state that "to attempt to analyze each finding would be a work of supererogation", they attack in general all of the findings relating to the above questions, basing their attack largely on the ground that the evidence produced by the respondents is unworthy of belief, and must be conclusively held to be overcome by other evidence. It would serve no useful purpose to review all of the voluminous evidence, but it may be observed in passing that nearly all of appellants' argument relates to the weight of the evidence and to pointing out conflicts therein in a manner entirely appropriate in a trial court but having no place on an appeal.

The appellants freely admit that the relationship of agent and principal existed between them and the respondents at the beginning of this transaction, and that during this relationship they informed the respondents that they had found such a woman who wanted a home, and who, not having the necessary cash, would take the property at a valuation of $2,500 and pay for it by transferring stock she owned in this corporation. However, they contend that they later informed the respondents that this woman would not make the deal, and that the respondents then asked them to buy the property themselves and pay for it with a similar amount of their own stock in the corporation. While they so testified, these facts are flatly denied by the testimony of the respondents, and Mrs. Logue admitted in her testimony that she at no time told the respondents that she was buying this property for her own use, explaining this by saying "it wasn't necessary when they knew I was buying it". While the appellants concede, as they must, that there is considerable evidence in the record to the effect that the respondents did not know that the appellants were themselves purchasing the property, they argue that it appears from all of the evidence that the respondents must have known this fact. ■ Among other things, they rely on the fact that the respondents signed a deed in which Mrs. Logue was named as grantee. Not only was a reason for this given, but such a fact in itself does not constitute such notice as is required to remove the taint from the purchase made personally by an agent (*Salisbury* v. *Yawger,* 184 Cal. 783 [195 Pac. 682]). Appellants further and particularly rely on the inference that the respondents must have seen the name of Mrs. Logue on two original certificates of stock in this corporation, which they insist were handed to the respondents for the purpose of having the same divided, and the stock represented thereby reissued one-half thereof to the respondents and the other half to Mrs. Logue. In this regard it appears that Mrs. Logue, prior to this transaction, had in her name two certificates, one for 80 shares of preferred stock and one for 40 shares of common stock in this corporation. Appellants testified in part that they gave these certificates to the respondents and that the respondents carried them to the office of the corporation, where they were

taken up and new certificates issued by which one-half of this particular stock was transferred to the respondents and the other half retained by Mrs. Logue. From this testimony appellants would draw the inference not only that the respondents read the original certificates and saw that they stood in the name of Mrs. Logue, but also that they knew from this that the appellants were the real purchasers.

If these were the only possible inferences to be drawn from this evidence, it might still be questioned whether the appellants had met the duty resting upon them. ▓ Upon the other facts shown, the burden of proof was upon the appellants to affirmatively show their good faith in the transaction and that they acted without concealment. (*Rubidoex* v. *Parks,* 48 Cal. 215; 2 Cor. Jur. 930.) An agent may not obtain any advantage over his principal by even the slightest misrepresentation or concealment (Civ. Code, sec. 2228). In *Williams* v. *Lockwood,* 175 Cal. 598 [166 Pac. 587, 588], the court said: "The acts of the agent are adjudged with almost, if not quite, the same strictness as those of a trustee. Where he deals with his principal, and obtains any benefit through the transaction, the law throws upon him, as upon a trustee, the burden of showing that an adequate consideration was paid, and that no unfair means of any kind were used by him to induce the contract." In *Firestone* v. *O'Brien,* 97 Cal. App. 43 [274 Pac. 1006, 1008], it is said: "The rule is to place the burden on the agent to make full *disclosure* promptly." In *Curry* v. *King,* 6 Cal. App. 568 [92 Pac. 662, 665], it is said: "An agent will not be allowed to deal in his own behalf with his principal with reference to the subject matter of the agency, unless he makes full, complete and honest disclosure of the truth of the transaction. He is bound to treat with his principal concerning the property over which he has been vested with authority in the utmost good faith, and so religiously does equity require adherence to this rule that a transaction between them as to the property whereby the agent acquires ownership thereof, is upon its face deemed by law to be fraudulent."

In *Cardozo* v. *Middle Atlantic Immigration Co.,* 116 Va. 342 [82 S. E. 80, 87], the court uses the following language, which is appropriate here:

"It is not enough for the broker or agent to say that he thought his principal was advised as to all the facts, nor is it sufficient if he be able to point out circumstances from which an inference might be drawn that the principal knew or had means of knowledge. It may be true that the principal has suffered no injury by reason of his ignorance of the facts, but the law makes no such inquiry. In order to remove temptation from the path of agents, as far as can be done, it stamps, from the motives of public policy, all such dealings with the seal of its condemnation. . . . In such cases, the amount of consideration, the absence of undue advantage, and other like features are wholly immaterial."

Even if such inferences as the appellants would draw were sufficient to meet the proof of good faith required on their part, the evidence upon which these inferences are based is so conflicting and unsatisfactory that the trial court was justified in drawing contrary inferences therefrom. Not only did the respondents testify that they did not know or even suspicion that the appellants were buying the house or that the stock they received came from them, and not only did the appellants admit that they did not in so many words tell the respondents what the situation was, but there is no evidence in the record to the effect that the respondents read the original certificates which the appellants say they handed to them, that these were read to them, that their attention was called to the fact that they stood in the name of Mrs. Logue, or that the respondents saw her name thereon. In fact the evidence that the certificates were handed to them at all is far from satisfactory. While at one time Mrs. Logue testified that she went to the home of respondents, handed them the certificates, and then went with them to the office of the corporation to have the transfer made, at another time she testified that she took them to the office of the corporation and then gave them the certificates. It must be borne in mind that in addition to the confidential relation between these parties, both through agency and family relationship, one of the appellants, J. J. Logue, was the vice-president of the corporation and its bookkeeper; that at the particular time he was largely in control of what was done by the corporation; and that as vice-president he even signed the new certificates which were

issued to replace the old. While the new certificates are dated the same day the old certificates were turned in, it appears that the respondents were given a temporary receipt, the giving of which is neither contradicted nor explained. The secretary of the corporation, who was present when the old certificates were brought in, testified as to what occurred at that time and, according to his testimony, all the instructions he received were given him by the appellants. Even with the added testimony of this more or less outside party, there is not a word of evidence in the record that at that time anything was said which would call the attention of the respondents to the matter of whose stock was being turned in and in part reissued to them, or that they were not receiving the full amount of the stock represented by the old certificates. While he testified that the appellants told him that Mr. Silver "had some stock which he wanted to transfer", and that he transferred it, his testimony contains no reference to any directions to divide the stock and reissue half thereof to Mrs. Logue as well as a portion to the appellants. The inference could well be drawn that such instructions were given when the respondents were not present, or that these details were privately arranged by Logue as an officer of the corporation. All of this, with the other evidence and with the reasonable inferences, fully justified the court in finding that the respondents did not know at the time that the stock they were receiving had previously been owned by the appellants.

Without going at length into the evidence, there are two items thereof which in themselves furnish strong support for the findings complained of. There is evidence that the house sold by the respondents was supposed to have been furnished; that shortly after the respondents delivered the deed to her, Mrs. Logue told them that the purchaser of the property was dissatisfied with the amount of furnishings left in the house, and that this purchaser wanted a number of additional sheets, pillow-cases, blankets and bedding of different kinds; and that, upon Mrs. Logue's representation that these articles were necessary to satisfy the purchaser, the respondents furnished and delivered them to her for the purchaser. Again after the deal was fully completed, Mrs. Logue signed and delivered to the respondents a receipt reading as follows:

"$125.00                                    Sept. 14, 1925.

"Received of Edith J. Silver One hundred twenty five dollars, being commission in full for sale of Pacific Grove property.

                           · "Mrs. J. J. Logue

                                    "Agent."

It is significant that although Mrs. Logue admitted signing this receipt and that it contained the word "commission" when she signed it, she stated she did not remember that the word "agent" was there when she signed, explaining: "If the word 'agent' had been put there before my signature, I would have signed under it." It fully appears that Mrs. Logue was a real estate agent of long experience, and the trial court could well have refused to place much reliance on this somewhat incredible attack on the receipt. Why she should have been paid a commission for selling the property if she was known to have been buying it herself, and why she should have then so signed as an agent is not satisfactorily explained, and this receipt furnishes strong corroboration of the abundant oral evidence produced by the respondents.

■ As to the second question, in connection with the disputed issues, while there is evidence that about a year later the appellants asked for and received from the respondents a quitclaim deed in order to correct a mistake in the original deed, and that they then told the respondents the property had been sold, there is no evidence that they told them when it was sold, that they themselves had sold it or that they had held title during the intervening years. The appellants were in the real estate business and if the respondents considered the matter at all, it is as reasonable to assume that they thought the appellants, as agents, had resold the property for the third party to whom it had been sold, as to assume that they must have known from the meager statement made to them that the appellants were then selling it for themselves. There is nothing in this portion of the evidence to compel the trial court to disbelieve the evidence of the respondents that they did not know at that time nor for a long time thereafter that the appellants were the purchasers of the property.

We have not attempted to review all of the evidence and are well aware of the fact that there is much evidence in the

record which would tend to support findings contrary to those made. This portion of the evidence, stressed by the appellants, merely presents a conflict which has been resolved against them by the trial court. A reading of the entire record not only discloses that the findings attacked are supported by ample evidence but, in our opinion, by a preponderance thereof.

The only other point requiring consideration is a claim that the judgment is excessive. The judgment was for $3,125, with interest, which included the $3,000 for which the appellants sold the property and the $125 paid them for a commission. The judgment contained appropriate provisions for the transfer to the respondents of the $2,700 mortgage which the appellants took back upon the property when they sold, with a corresponding credit on the judgment. It is argued that the measure of damages in such a case is the secret profit made by the agent, that this profit amounted to $500 only and that the judgment could not exceed that amount. It is further argued that the respondents previously received stock of the value of $2,500, and that the judgment rendered gives them a double recovery. It may first be observed that there is no evidence to show that the stock in question was worth $2,500 at the time it was received by the respondents. There is evidence that about nine months before the transaction here in question an audit was made of the corporation affairs, upon the strength of which audit a dividend was paid some months before this transaction occurred. While there is evidence that this audit showed that, at the time it was made, the common stock was worth $10 or $12 a share, there is neither evidence as to what the preferred stock was worth at that time nor as to what any of the stock was worth at the time of the sale involved here, although it does appear that it was entirely valueless about a year later. However, we think it is immaterial what the stock was worth at the time of the transfer. The rule of damages contended for by appellants and the cases cited in support thereof have no bearing here. This is not an action for damages or the ordinary action to recover the secret profits made by an agent in violation of his fiduciary relationship. This is essentially an action for rescission although the ordinary form of rescission could not be had

since the property had been transferred to an innocent third party. This action was one to compel the appellants to account not only for the profits they had received but for all they had received, including the amount paid as a commission. It is based upon the theory that in equity the appellants held these sums in trust for the respondents. Whether or not the respondents received anything of value, they tendered back what they had received and, at the time of the trial, delivered the same into court for the appellants. It having been found upon sufficient evidence that these agents purchased this property from their principals under circumstances where the principals were justified in believing and believed that the property was being sold to a third party, and where the true facts were not disclosed to the principals, both the form of the action and the judgment are, under well-settled principles, consistent with the rules of equity and are sustained thereby (*Curry* v. *King, supra; Williams* v. *Lockwood, supra; Firestone* v. *O'Brien, supra; Burke* v. *Bours,* 92 Cal. 108 [28 Pac. 57]; *Whitaker* v. *Brainard,* 113 Cal. App. 705 [298 Pac. 1042]; Pomeroy's Equity Jurisprudence, 3d ed., vol. 2, sec. 959, vol. 3, sec. 1047; 1 Cal. Jur. 789).

The judgment appealed from is affirmed.

Marks, J., and Jennings, J., concurred.