[L. A. No. 19512. In Bank. May 21, 1946.]

W. S. RATTRAY, Respondent, v. HUBERT B. SCUDDER, as Real Estate Commissioner, etc., Appellant.

Robert W. Kenny, Attorney General, Walter L. Bowers, Assistant Attorney General, and Carl S. Kegley, Deputy Attorney General, for Appellant.

Mack, Werdel & Bianco and D. Bianco for Respondent.

Hyman & Hyman as Amici Curiae on behalf of Respondent.

TRAYNOR, J.—By an order issued April 10, 1944, defendant revoked plaintiff's license as a real estate broker. The trial court issued a writ of mandamus commanding defendant to set aside this order. Defendant appeals.

Plaintiff is a real estate broker associated with Kelly & Son in Bakersfield. Upon a complaint filed with defendant by John L. Humston, then a lieutenant in the United States Army, defendant initiated proceedings against plaintiff and Edward A. Kelly for the revocation of their licenses as real estate brokers. After a hearing defendant made the following findings: "That on or about January 19, 1943, defendant Rattray addressed a letter to complainant requesting price and terms on property, consisting of a seven-unit court, which he owned in Bakersfield, California; that on February 4, 1943, the complainant replied, and placed a price of $13,000 on said property, and also stated that he would consider any fair offer; that on February 11, 1943, defendant Rattray wrote a second letter to complainant advising him that the property had been appraised by a competent appraiser; that $12,000 would be a fair price, and that selling commission would be added; that in said letter was enclosed an instrument, designated as an option, for a sixty day period, in favor of Kelly & Son, embodying the selling price of $12,000, for the signature of the complainant; that relying on those representations the complainant signed said option, and returned it to defendants; that on March 20, 1943, a third letter was addressed to complainant by defendant Rattray stating that in trying to sell the property he was meeting with certain obstacles, namely, the price and the fact that the property was in an unrestricted district, and suggested to complainant that the price be reduced to $10,000 cash, which he thought the complainant would be wise in accepting, and pressed said complainant for an immediate acceptance so that the transaction might be consummated 'within the period of our exclusive listing'; that on April 15, 1943, a long distance telephone conversation was held between defendant Rattray and the complainant, at which time defendant Rattray repeated that $10,000 net was the very best price that he could obtain; that complainant countered by stating he would accept no less than $10,500 net cash, but finally compromised on a price of $10,250 net cash with no expense to him in the transaction;

"That during the negotiations with complainant as set out in the preceding paragraph, defendant Rattray led complainant to believe that he was acting as his agent in this transaction, and when terms and price were agreed upon, that all necessary expenses incident to the sale, together with the regular 5% selling commission, would be added, and relying

upon this belief the complainant accepted the $10,250 net cash for the said property, and would not have done so but for his reliance upon that belief and understanding;

"That prior to April 15, 1943, the said defendant Rattray negotiated with one David L. Espey for the purchase of said property for the total price of $13,500; that on April 16, 1943, the property was sold to David L. Espey, and placed in escrow, for the sum of $13,500; that by refinancing, and the complainant deeding the property to defendant Edward A. Kelly, who in turn in the same escrow, deeded the property to David L. Espey, the escrow was duly closed;

"That notwithstanding the negotiations with David L. Espey, the defendant Rattray did not disclose the same to complainant, and at no time told him that he was attempting to sell the property for $13,500; that after all expenses were paid incident to the transaction, defendant Edward A. Kelly received the sum of $2,326.25, together with a note signed by David L. Espey in the sum of $700; that out of the cash received by defendant Edward A. Kelly, the sum of approximately $900 was paid to defendant Rattray;

"That all of the correspondence, negotiations, and representations made in this matter were carried on and made by defendant Rattray; that each and every one of the letters to complainant were on the letterheads of Kelly & Son, and signed 'W. S. Rattray for Kelly & Son'; that defendant Edward A. Kelly, during the negotiations, did not in any way communicate with complainant, and therefore it is not clear that he had guilty knowledge of the statements and representations made to complainant by defendant Rattray; that inasmuch as there is some doubt in this regard, the Commissioner will waive the doubt in favor of defendant Edward A. Kelly."

Defendant concluded that the revocation of plaintiff's license was warranted under sections 10176(f) and 10177(f) of the Business and Professions Code: "The commissioner may, upon his own motion, and shall upon the verified complaint in writing of any person, investigate the actions of any person engaged in the business or acting in the capacity of a real estate licensee within this State, and he may temporarily suspend or permanently revoke a real estate license at any time where the licensee within the immediately preceding three years, while a real estate licensee, in performing or attempting to perform any of the acts within the scope of this chapter

has been guilty of any of the following: . . . Any other conduct, whether of the same or a different character than specified in this section, which constitutes fraud or dishonest dealing.'' (§ 10176 (f) ) ''The commissioner may suspend or revoke the license of any real estate licensee, who within three years immediately preceding has done any of the following: . . . Acted or conducted himself in a manner which would have warranted the denial of his application for a real estate license, or for a renewal thereof.'' (§ 10177 (f) )* A real estate license can be denied if the applicant fails to furnish proof of ''honesty, truthfulness and good reputation.'' (§§ 10150, 10152.)

The trial court did not hear any additional evidence. Basing its findings on the commissioner's record of the two hearings before the commissioner, the trial court found: ''it is true that at neither of said hearings was there any evidence that the plaintiff herein was acting as the agent for the complainant John L. Humston; it is true that said John L. Humston never agreed to pay any commission to the plaintiff herein for any of the services of the plaintiff; it is true that the complainant John L. Humston on February 15, 1943, executed to the plaintiff herein and his associates an option to purchase the real property of the complainant; it is true that at no time pertinent herein did the relationship of principal and agent ever exist between the plaintiff herein and the said complainant John L. Humston; it is true that at no time pertinent herein did any relationship of trust and confidence ever exist between the plaintiff herein and the said complainant John L. Humston; it is true that the plaintiff herein in handling the transaction referred to in the complaint of said John L. Humston filed with the defendant herein was not guilty of any conduct which constituted fraud or dishonest dealing and had not acted or conducted himself in any manner which would have warranted the denial of his application for a license or of the renewal of his then existing license.'' With respect to the commissioner's findings the trial court

*Under the statute in effect at the time of plaintiff's activities (§ 12 of the Real Estate Act as amended by Stats. 1937, p. 2124), the commissioner could revoke the license of any licensee who within the immediately preceding three years conducted himself in a manner that would have warranted the denial of his application for a license or a renewal thereof, or who was guilty of any conduct constituting fraud or dishonest dealing. Those provisions were incorporated without change into sections 10176 (f) and 10177 (f) of the Business and Professions Code (Stats. 1943, ch. 127 § 1, p. 841-842) under which plaintiff's license was revoked.

found: "it is true that the said findings do not support the order of the defendant revoking the license of the plaintiff and it is true that the evidence does not support the order of the defendant in revoking the license of the plaintiff; it is true that in revoking the license of the plaintiff the said defendant acted arbitrarily, capriciously and contrary to law and that his findings and order are unsupported by evidence."

In this state all real estate licenses expire automatically on June 30th of each year. (Bus. & Prof. Code, § 10200.) The present litigation has not become moot because plaintiff's license would have expired in any event on June 30, 1944. The rights of plaintiff depend on whether or not that license was validly revoked, for if it was, a new license may be withheld on the same ground. (Bus. & Prof. Code, §§ 10150, 10153.)

In determining this appeal it is not necessary to discuss the scope of review by the trial court of the commissioner's proceedings (see *Dare* v. *Medical Examiners,* 21 Cal.2d 790 [136 P.2d 304]; *Sipper* v. *Urban,* 22 Cal.2d 138, 140 [137 P.2d 425]), for even if the record of these proceedings is read as if the evidence before the commissioner had been taken by the trial court itself, the trial court's decision finds no support in the evidence.

The evidence shows without conflict that plaintiff was employed by Humston as a broker. The correspondence initiating the relation between Humston and plaintiff leaves no doubt that plaintiff offered Humston his services as a broker and that Humston retained him in that capacity. On January 19, 1943, plaintiff wrote to Humston on stationery of "Kelly & Son, licensed real estate brokers" as follows: "We have a client who is interested in purchasing property in this district and thought you might wish to sell your property. Accordingly, we will be pleased to receive the price and terms acceptable to you, and enclose stamped envelope for your reply." When Humston advised plaintiff that he was willing to sell the property for $13,000, to take a small second mortgage, and to consider any fair offer, plaintiff replied: "Our prospective buyer lives in Taft, so we will not contact him until we have heard from you again. We have had your property appraised by a competent appraiser. Considering the age of buildings and furniture, which has a heavy depreciation, a fair price would be $12,000.00. To this we would have to

add the selling commission presuming that we can arrive at a mutually satisfactory basis. We are enclosing herewith an option for your signature. Upon receipt of the signed option and your reply, we will proceed with the work of closing the sale. Please state what terms you are willing to make in the space marked with the cross. It may be that our client will not require any terms, but in the event he should, we would like to know what to quote him.'' These letters were introduced in evidence before the commissioner and there was no evidence contradicting them. They show indisputably that plaintiff offered his services and was employed to find a purchaser willing and able to acquire the property for $12,000 plus a selling commission for plaintiff. Plaintiff himself testified as to his first letter: ''My purpose for writing the letter was to get a listing of the property so I could sell it, provided I would be able to have authority to sell the property—to any person whom I might contact who was willing to buy it.''

The evidence also shows without conflict that once plaintiff was employed by Humston he reported to him as a broker does to his principal. Uncontradicted documentary evidence was introduced, a letter by plaintiff to Humston, written more than a month after their initial correspondence stating: ''We have been diligently working to find a purchaser for the Court on 'P' Street, but two of the obstacles in the way of effecting a sale have been: First, the district being unrestricted has been objectionable to two or three people who otherwise might have considered the property. The second objection is the price. As the property was purchased through this office, we are able to arrive at a more definite valuation than some other office who might not be as well posted as we are. Our purpose for writing you this morning is to inquire whether you would consider $10,000.00 cash, as we have a prospect now, who will likely purchase this property providing we can do some financing for him. Since buying the property through this office some years ago, there has been a depreciation of 3% a year, which would total at least $2,000.00. We, therefore, believe that under present conditions you would be wise in accepting this cash offer, providing we are able to arrange the financing as hereinabove referred to. Will you therefore, let us know immediately if this will be acceptable to you, so that we can proceed with our work. In the event you would consider this offer, we would most likely be able to give you definite information on the sale within the period

of our exclusive listing." The evidence of this letter that plaintiff acted as a broker and represented himself to Humston as such is corroborated by his own testimony: "I cannot give the verbatim—along the lines of selling the property—told him working diligently on it—had several inquiries—several had complained about the price being too high—told him had advertised it for fifteen thousand and then thirteen and showed him the ads—others had complained about the unrestricted district—the objections that I pointed out to him. However, I would do the very best I can and get in touch." It is clear that this conversation could not have occurred had not plaintiff considered himself Humston's broker and actively sought a purchaser.

The evidence also shows without conflict that after plaintiff secured a purchaser for the property he violated his fiduciary duties as a broker and by untruthful and misleading statements induced his principal to reduce the price placed upon the property and to sell it to plaintiff's firm. The testimony of Mr. Espey, who acquired the property, was uncontradicted that he saw plaintiff in the latter part of March and told him that although he deemed the property worth not more than $12,500 he would be willing to buy it for $13,500. "I told him I knew that I was light as far as the down payment was concerned; that I had another property on Parkway and Pine that I could use as a possible—as part of the down payment. I told him at the time that because of the neighborhood that I did not consider the property worth any more than $12,500, but would be willing to give $13,500 because of the way I would be buying it—that the property itself, regular income and that sort of thing seemed to make it a profitable venture and I would be willing to take over the deal on that basis." Espey also testified without contradiction that a week or more after this first conversation he had another conversation with plaintiff in which plaintiff told him that he had not been able to induce the owner of the property, Mr. Humston, to reconsider the price that he was asking for the property, that he had some doubt whether he would be able to let Espey have the property for $13,000 and that there might be some difficulty in financing the deal because of the small amount of cash that Espey had but that Espey should leave the matter in plaintiff's hands. Plaintiff's firm got in touch with one Ceccarelli and his wife, who had

done business with Kelly & Son for twenty-five years, with regard to a loan to Espey. They first discussed the matter with Mrs. Ceccarelli and showed her the property and later showed the property to Ceccarelli. The first installment of the loan was received on April 16, 1943, and the balance on April 30, 1943. On April 15th plaintiff had a long distance telephone conversation with Humston as follows: "I told Lt. Humston that I was unable to sell his property for the price he had placed upon it, and the only way we could get him $10,000 cash would be to buy it ourselves. He said 'I won't accept it; I will accept $10,500.00, if that is all you will give.' I said 'we will not pay $10,500.00; we will pay $10,000.00.' He said, 'Will you pay $10,250.00?' I said 'Will you accept $10,-250.00?' 'Yes,' he said, 'I think, I will.' I said 'Will you confirm that by wire?' That was the entire conversation as I recall." Plaintiff's own testimony thus shows that he did not reveal to Humston that Espey was willing to buy the property for a price exceeding the $12,000 that Humston had originally asked for the property or the amount of $10,750 that he had asked later, but made the untruthful statements to Humston that "I was unable to sell his property for the price he had placed upon it" and that "the only way we could get him $10,000 cash would be to buy it ourselves." After receiving Humston's telegram reducing the price to $10,250 plaintiff sold the property to Espey the next day, April 16, 1943, for $13,500. Documentary evidence introduced before the commissioner showed without conflict that Espey signed the note for the loan of $12,500 and the deed of trust securing it on April 16th; that on the same day the escrow instructions were given by Espey; that both sales, the sale by Humston to Kelly & Son and the sale by Kelly & Son to Espey, were completed in the same escrow; that Kelly & Son or plaintiff never paid any part of the purchase price to Humston from their own funds, but received out of the escrow about $12,800 in cash and a note of about $700 secured by second deed of trust; and that the $10,250 paid by Kelly & Son to Humston were simply deducted from the cash amount of $12,800 received by Kelly & Son.

In the light of the uncontradicted documents and plaintiff's own testimony, it cannot be questioned that plaintiff violated the fiduciary duties of a real estate agent, for "The law of California imposed on . . . the real estate agent the same obligation of undivided service and loyalty that it im-

poses on a trustee in favor of his beneficiary. Violation of his trust is subject to the same punitory consequences that are provided for a disloyal or recreant trustee. (*King* v. *Wise,* 43 Cal. 628.)'' (*Langford* v. *Thomas,* 200 Cal. 192, 196 [252 P. 602].) ▉ Such an agent is charged with the duty of fullest disclosure of all material facts concerning the transaction that might affect the principal's decision. (Civ. Code, § 2230; *Langford* v. *Thomas, supra,* 197; *Williams* v. *Lockwood,* 175 Cal. 598, 601 [166 P. 587]; *Feckenscher* v. *Gamble,* 12 Cal.2d 482, 495 [85 P.2d 885]; *Curry* v. *King,* 6 Cal.App. 568, 575 [92 P. 662]; *Silver* v. *Logue,* 127 Cal.App. 565, 571 [16 P.2d 183]; *Jolton* v. *Minster, Graf & Co.,* 53 Cal.App.2d 516, 522 [128 P.2d 101]; *Baird* v. *Madsen,* 57 Cal.App.2d 465, 476 [134 P.2d 885].) ▉ In the present case, there can be no doubt that Humston would not have sold the property to Kelly & Son for $10,250 had he known that Espey stood ready to buy the property for $13,500. Nor could plaintiff have any doubt that had Humston known this fact he would not have sold the property to Kelly & Son. He not only failed to disclose the truth but made the misrepresentation that he was unable to sell the property at the price placed upon it by Humston. Even if plaintiff had not been Humston's broker and under no fiduciary duties, once he discussed the question whether a higher price was obtainable, he had to ''speak the whole truth, and not by partial suppression or concealment make the utterance untruthful and misleading.'' (*American Trust Co.* v. *California etc. Ins. Co.,* 15 Cal.2d 42, 65 [98 P.2d 497].)

The finding of the trial court that there was no evidence that plaintiff was acting as Humston's agent is so clearly inconsistent with the documentary evidence as well as plaintiff's own testimony that it can be explained only as being based upon the theory that, since plaintiff's firm had an option to purchase and did purchase the property, plaintiff could deal with Humston at arm's length and was not bound by any fiduciary duties. It does not follow, however, that plaintiff was not acting as a broker in this matter. ▉ It is well settled that a broker employed to find purchasers for the property of his principal can be given an option, ''running concurrent with the agency'' to purchase the property. (*W. G. Reese Co.* v. *House,* 162 Cal. 740, 744 [124 P. 442]; *Burt* v. *Stringfellow,* 48 Utah 330 [159 P. 527]; *Neighbor* v. *Pacific*

*Realty Association,* 40 Utah 610 [124 P. 523, 34 Ann.Cas. 1914D 1200]; *Walling* v. *Poulsen,* 160 Mich. 392 [125 N.W. 373]; Rest., Agency, § 390; see 4 Cal.Jur. 554; 12 C.J.S. 33; 8 Am.Jur. 1040.) ■ In such a case, the broker, when pursuing his own interests, cannot ignore those of his principal and will not "be permitted to enjoy the fruits of an advantage taken of a fiduciary relation, whose dominant characteristic is the confidence reposed by one in another." (*Curry* v. *King, supra,* 6 Cal.App. 568, 575.) It has therefore been stated that, "The law does not allow the agent who has also a right to purchase to wait until someone makes an offer of an amount in excess of the agreed purchase price and then elect to purchase the property at the lesser price without informing the owner of the higher offer, and after the agent has obtained the consent from the owner to buy the property, then immediately sell it for the higher price as his own property." (*Neighbor* v. *Pacific Realty Association, supra,* 40 Utah 610 [124 P. 523, 34 Ann.Cas. 1914D 1200].) The law is well summarized in 8 American Jurisprudence 1040: "If a broker employed to sell property is also given . . . an option to purchase the property himself, he occupies the dual status of agent and purchaser and he is not entitled to exercise his option except by divesting himself of his obligation as agent by making a full disclosure of any information in his possession as to the prospect of making a sale to another. . . . But if he exercises his option before any negotiations for its sale to another have been made and without knowledge of anyone wishing to purchase, he is not obliged to account to the owner on resale to another." ■ One who acts as an agent and also deals with his principal as to the subject matter of the agency cannot take advantage of his principal by withholding from him information secured by means of the agency. In the language of the Restatement of Agency: "Before dealing with the principal on his own account . . . an agent has a duty, not only to make no misstatements of fact, but also to disclose to the principal all material facts fully and completely. A fact is material . . . if it is one which the agent should realize would be likely to affect the judgment of the principal in giving his consent to the agent to enter into the particular transaction on the specified terms. Hence, the disclosure must include not only the fact that the agent is acting on his own account . . ., but also all other facts which he should realize have or are likely to have a bearing upon the

desirability of the transaction from the viewpoint of the principal." (§ 390, Comment a.) ▮▮▮ When plaintiff disclosed no more to his principal than that Kelly & Son was buying the property he fell short of his duties as an agent. It was his duty to advise Humston fully of the pending negotiations with Espey. Plaintiff not only violated his fiduciary duty of disclosure, but went beyond the limits that the law draws even for one who has no fiduciary duties, for he misrepresented the facts when he assured Humston that he could not obtain the price placed upon the property and that Humston could do no better than to sell to Kelly & Son at a reduced price. The fact that Espey had only $400 cash and that therefore the greater part of the purchase price had to be covered by a loan affords no excuse for plaintiff's conduct. From the standpoint of the seller Espey was as much a cash buyer as one who did not need a loan. It was immaterial to Humston whether the cash came from the purchaser's own funds or whether he had to secure it from a lender. Since Kelly & Son's sale to Espey resulted in the receipt of approximately $12,800 cash it is clear that Humston would have gained more from a sale to Espey than the one to Kelly & Son. Moreover it was understood that plaintiff would attempt to obtain a loan for a purchaser. In one of his letters plaintiff asked Humston whether he "would consider $10,000 cash, as we have a prospect now who will likely purchase this property providing we can do some financing for him." It does not matter, however, whether plaintiff was under any obligation to Humston to attempt to secure a loan for Espey. The decisive consideration is that when he suggested to Humston that the latter sell the property to plaintiff's firm, he was under a duty to disclose that Espey would pay $13,500 for the property if his purchase could be financed by a private loan and to disclose the negotiations made to secure that loan. It is immaterial that Humston, according to plaintiff's testimony, later said to plaintiff: "I don't know what you folks got out of it, but I am satisfied with it. I will have a little over nine thousand dollars when I pay some few bills." At that time Humston did not know that plaintiff had misled him when he induced him to reduce the price. When Humston learned that he had been misled he filed his complaint with the commissioner.

The present case is clearly distinguishable from *Schomig* v. *Keiser*, 189 Cal. 596 [209 P. 550], on which plaintiff relies,

for in that case it was held that the licensee's fraudulent conduct was unconnected with his activities and duties as a broker.

The judgment is reversed.

Gibson, C. J., Edmonds, J., and Spence, J., concurred.

CARTER, J.—I dissent. The majority opinion is based upon the premise that: "In determining this appeal it is not necessary to discuss the scope of review by the trial court of the commissioner's proceedings (see *Dare* v. *Medical Examiners,* 21 Cal.2d 790 [136 P.2d 304]; *Sipper* v. *Urban,* 22 Cal. 2d 138, 140 [137 P.2d 425]), for even if the record of these proceedings is read as if the evidence before the commissioner had been taken by the trial court itself, *the trial court's decision finds no support in the evidence."*

The italicized statement is not borne out by the record, and this error in premise has resulted in an erroneous conclusion. The fact is that at a hearing before defendant Real Estate Commissioner upon a complaint filed against plaintiff Rattray by one Humston, the evidence adduced was not only conflicting in some respects but such facts as were established without dispute gave rise to conflicting inferences. The commissioner resolved the conflict against plaintiff and concluded that the revocation of his license was warranted. (Bus. & Prof. Code, §§ 10176f, 10177f.)

In reviewing the matter upon an alternative writ of mandate, the superior court received in evidence only a transcript of the record made at the commissioner's hearing. From this record and the conflicting showing therein, the superior court concluded that in revoking plaintiff's license, the commissioner "acted arbitrarily, capriciously and contrary to law and that his findings and order are unsupported by the evidence," and that plaintiff *"was not guilty of any conduct which constituted fraud or dishonest dealing. . . ."*

From the facts I am convinced that the learned trial judge was justified in concluding, as he did, that plaintiff was not guilty of fraud, dishonest dealing, or other conduct warranting the revocation of his license as a real estate broker. Such being the state of the record, the question arises as to the power of the trial court to review the factual determination of an administrative agency. On this question the views of the members of this court have been and are in sharp dis-

agreement. (See *Sipper* v. *Urban,* 22 Cal.2d 138 [137 P.2d 425]; *Russell* v. *Miller,* 21 Cal.2d 817 [136 P.2d 318]; *Dare* v. *Medical Examiners,* 21 Cal.2d 790 [136 P.2d 304]; *Laisne* v. *California St. Bd. of Optometry,* 19 Cal.2d 831 [123 P.2d 457], and order denying petition for hearing in *Wyatt* v. *Cerf,* 64 Cal.App.2d 732 [149 P.2d 309].) The majority view is that in a mandamus proceeding to review the action of an administrative board, the findings and order of the board have not the finality of a court judgment, and, although no new evidence is received, the court can make findings and conclusions and render judgment contrary to the determination reached by such board. The minority view is that the factual determination of the administrative board is binding on the court unless it is lacking in evidentiary support, and that relief should be sought by certiorari rather than by mandamus.

In his dissenting opinion in the Laisne case, *supra,* Chief Justice Gibson said at page 868: ''Where there is neither a constitutional nor statutory requirement that a court make the determination of fact or reweigh the evidence upon which the administrative agency acted, the duty of the judicial branch is adequately fulfilled by a review upon certiorari which extends to the questions of law involved. A review upon the issues of law would, of course, include such questions as whether the agency has regularly pursued the authority vested in it, whether it has acted arbitrarily and whether there is substantial evidence to support its determinations of fact. Our decisions have recognized that administrative rulings on questions of law cannot be accorded finality. Such questions may be determined conclusively only by a court exercising constitutional judicial power. [Citing authority.] *Upon issues of fact, however, where there is no constitutional requirement that the facts be judicially determined and no statutory indication that the review was meant to extend to a re-examination of questions of fact, the court should uphold the administrative determination unless it is found that there is no substantial evidence to support the finding.* . . . The proceeding in mandamus in the present case should be treated as a proceeding in certiorari [citing authority], and the judgment of the trial court should be affirmed.'' (Emphasis added.) Mr. Justice Edmonds and Mr. Justice Traynor concurred with the chief justice in his dissenting opinion in the Laisne case. In his dissenting opinion in the Dare case, *supra,*

Mr. Justice Traynor stated at page 805: "In an actual certiorari proceeding, the court would be confined to the record of the proceedings before the administrative board, and the board's determination would be quashed if the record disclosed that the board had acted outside its jurisdiction, or had made serious errors of law in the exercise thereof, or that its decision was not supported by substantial evidence. Under the system devised by the majority, however, the record is considered and weighed along with other evidence, a procedure unknown to the common law." The chief justice and Mr. Justice Edmonds concurred with Mr. Justice Traynor in his dissenting opinion in the Dare case. While the majority opinion in the case at bar is written on the theory that the rules applicable to mandamus and not certiorari are here involved, it fails to apply said rules, and, in fact, applies the rules applicable to certiorari.

It must be conceded that this is a proceeding in mandamus and that the sole question here involved is whether there is any substantial evidence to support the findings of the trial court. The majority opinion answers this question in the negative, but fails to review and consider the evidence in the light of the conflicting inferences deducible therefrom, from which it is obvious that there is ample evidentiary support for such findings. The majority opinion sets forth *in haec verba* and at great length the findings of the Real Estate Commissioner determining the facts adverse to plaintiff, and concludes that these findings are sustained by the evidence. Said opinion also sets forth brief excerpts from the findings of the trial court which determined the facts contrary to the findings of the commissioner, and then concludes that "the trial court's decision finds no support in the evidence." This statement in the majority opinion is refuted by the record.

The evidence which amply supports the superior court's findings and conclusions, and the inferences of which it is reasonably susceptible may be epitomized as follows:

In January, 1943, plaintiff Rattray, who had for more than 35 years been operating as a real estate broker in California, was associated with the firm of Kelly & Son in Bakersfield. On January 19th, using a firm letterhead, he addressed a letter of inquiry to John L. Humston, stating that the firm understood that Mr. Humston owned certain auto court property which he might wish to sell and that they would "be pleased

to receive the price and terms acceptable to you, and enclose stamped envelope for your reply.''

Mr. Humston, then a second lieutenant in the Army, stationed in Ohio, replied on February 4th, stating: ''We would like to sell this property the price is $13,000 and we might take a small second mortgage. . . . We would like to sell the court and would consider any fair offer. . . .''

When Mr. Rattray discussed with Mr. Kelly listing the property through the office of Kelly & Son, Mr. Kelly instructed him to procure an option, saying, so he testified: ''I told Rattray that due to my—due to a good many dealings I had had with Mr. Humston which were unsuccessful, and that he was a troublemaker, that the only manner in which I would deal would be on an option for it and a consideration was paid.''

Rattray wrote Humston on February 11th mentioning that there was a prospective buyer for the property in Taft (this was not the ultimate purchaser), and that they had had the property appraised. He then said: ''Considering the age of the buildings and furniture, which has a heavy depreciation, a fair price would be $12,000. To this we would have to add the selling commission, presuming that we can arrive at a mutually satisfactory basis. We are enclosing herewith an option for your signature. Upon receipt of the signed option and your reply, we will proceed with the work of closing the sale. Please state what terms you are willing to make in the space marked with the cross. It may be that our client will not require any terms but in the event he should, we would like to know what to quote him.''

This letter and the option, which was in standard form, and named Kelly & Son as optionee, were received by Humston at San Diego. He understood the wording of the document and wrote in it the following terms for payment of a $12,000 purchase price, to wit: ''$10,000 cash $2,000 at 8%.'' He signed the option and mailed it back to Kelly & Son without comment. By the terms of the option Humston agreed to sell the property to Kelly & Son within 60 days for $12,000.

Thereafter, on February 20th, Rattray advertised the property in a local paper for sale at $15,000; later it was advertised at $13,500. On March 20th Rattray wrote Humston that he had been working diligently to find a purchaser for the court but that two obstacles in the way of effecting a sale

had been: "First, the district being unrestricted has been objectionable to two or three people who otherwise might have considered the property. The second objection is the price." He also stated: "Our purpose for writing you this morning is to inquire whether you would consider $10,000.00 cash, as we have a prospect now who will likely purchase this property providing we can do some financing for him. . . . We . . . believe that under present conditions you would be wise in accepting this cash offer, providing we are able to arrange the financing as hereinabove referred to. Will you, therefore, let us know immediately if this will be acceptable to you so that we can proceed with our work. In the event you would consider this offer, we would most likely be able to give you definite information on the sale within the period of our exclusive listing."

Following the receipt of this letter, Humston was in Bakersfield and talked with Rattray personally. Rattray showed him the advertisements, promised to work diligently on the property, and asked him to reduce the price another $2,000 to make it easier to sell. About this time one Espey called at the office of Kelly & Son in response to the $13,500 advertisement, but he had only $400 cash. Rattray does not recall whether he mentioned Espey to Humston as a prospective buyer. At any rate, on April 2d Rattray wrote Humston at San Diego as follows:

"As we expected to hear from you before leaving Bakersfield and not having received any word, we are wondering if we misunderstood you. The party we have been negotiating with has telephoned us twice since we talked with you, requesting that we give him an answer. . . . As our time is running short under our option, we would like to either proceed with our work of endeavoring to get this property financed so as to give you $10,000.00 cash for your Court property, or if we should be unsuccessful in accomplishing this, or should you not be willing to accept this offer, then we would like to continue our efforts to find another purchaser. . . . We would also like to know if you would extend our option for another 60 days, provided we are unable to consummate a deal for you before our time expires. We would appreciate an answer from you by wire. . . ."

On April 6th, in response to this letter, Humston wired: "Will take ten thousand seven fifty net."

On April 15th, which was the last day of the option, Rat-

tray called Humston by telephone. He told him that he could not find anyone who could pay $10,000 cash; that the only way that they could get that amount of cash was for them to buy the property themselves. Humston offered to sell for $10,500. Rattray refused the offer. Humston then stated he would take $10,250 cash. Rattray asked that this offer be confirmed by wire, and told Humston that Mr. Kelly was buying the property. Humston thereupon wired, ''Will take ten thousand two hundred and fifty net cash within thirty days.''

Following the telephone conversation Rattray opened an escrow and forwarded to Humston for execution a deed of the property to Mr. Kelly. Later escrow instructions were sent. Humston understood the purport of these documents, and in fact added two paragraphs to the escrow instructions imposing certain specifications of his own. He knew that he was selling his property to Mr. Kelly for a cash price of $10,250. However, he testified that he thought Mr. Kelly would resell it only for an amount which would give him a selling commission of 5 per cent and expenses. Instead of this, Mr. Kelly consummated a deal whereby he arranged certain financing, and thus procured a higher profit.

Negotiations had been kept open with the prospect Espey. On April 16th, the day after the Kelly purchase, Mr. Rattray telephoned Espey, stating that they could put through a deal for him at $13,500. This deal was consummated. Most of the details were arranged on April 16th. Espey paid in his $400. Mr. Kelly procured a $12,500 loan from a private individual who had faith and confidence in his recommendation. The money was advanced in two installments, on April 16th and April 30th. This loan was secured by first mortgage on the property purchased and also on other property owned by Espey. The sum of about $700, needed to complete the transaction, was represented by a second mortgage to Mr. Kelly. The profit to Mr. Kelly amounted to $2,326.25, of which Rattray received some $900.

Humston paid no commission to Rattray or Kelly & Son for handling his property. He admittedly knew that a sale and resale were contemplated. A few days after April 15th he made a trip to Bakersfield and talked with Mr. Espey but did not ask him how much he paid for the property. He also called at the office of Kelly & Son, and according to the testimony of Rattray, said: ''I don't know what you folks

got out of it, but I am satisfied with it. I will have a little over nine thousand dollars when I pay some few bills.'' Later he discovered the price to Espey and filed a complaint with the Real Estate Commissioner.

The superior court found that at the hearings before the commissioner there was no evidence that plaintiff was acting as agent for Humston; that Humston never agreed to pay any commission to plaintiff; that Humston executed the option of February 15th; that at no time did the relationship of principal and agent ever exist between plaintiff and Humston, nor did any relationship of trust and confidence ever exist between them; that in the handling of the transaction plaintiff was not guilty of any conduct which constituted fraud or dishonest dealing and that he did not act or conduct himself in any manner which would warrant the denial of his application for a license or for a renewal thereof.

The facts afford ample support for the conclusion that the relationship created by Humston's dealings with Rattray was that of vendor and purchaser, and not that of principal and agent. As said in the case of *Smith* v. *Blodget,* 187 Cal. 235, 240 [201 P. 584]: ''Whether an agreement permitting a person 'to sell' land on certain terms creates the relation of principal and agent or that of vendor and purchaser under a contract of sale depends upon the intention of the parties. (James on Law of Option Contracts, § 114.) Where there was a revocable authorization to a firm of real estate agents to *sell* land for ten thousand dollars net to the owners, with an agreement to pay 'a commission of all over said sum of ten thousand dollars net, for which they may sell said property with our consent,' it was held in this state that a sale by the firm under this agreement was effected in the capacity of vendor on its own account and not as agent of the owners of the land. (*Robinson* v. *Easton, Eldridge & Co.,* 93 Cal. 80, [27 Am.St.Rep. 167, 28 P. 796].) The determining factor in that case was the direct interest in and right to a part of the proceeds of the sale which was granted to the persons making the sale. The written instrument in the case at bar contains no express provision that plaintiffs shall retain that portion of the purchase price which exceeds the specified selling price, . . . But the broad and unrestricted provision giving Smith the right to effect a sale at a net price to the owners of one hundred dollars per acre is susceptible of sundry interpretations. . . . The case here presented is one where the intention

of the parties is imperfectly expressed and the language employed by them is ambiguous and requires interpretation. It was, therefore, permissible for the court to take into consideration the construction placed upon the instrument by the various persons concerned. (*Mitau* v. *Roddan,* 149 Cal. ██ 2, 14, [6 L.R.A.N.S. 275, 84 P. 145].) Taking into consideration the dealings previously set forth, the various assignments of the option and the manner in which the sale was conducted by all the persons involved, the evidence must be held sufficient to support the finding of the trial court 'that the said instrument was acted upon and construed by the grantors thereof and all the parties to this action as an option and not as a mere agency authorization.' "

The doctrine of this case has been recognized and applied in *Ruess* v. *Baron,* 217 Cal. 83 [17 P.2d 119]; *Tufts* v. *Mann,* 116 Cal.App. 170 [2 P.2d 500]; and *Cook* v. *La Vina Land Co.,* 3 Cal.App.2d 21 [39 P.2d 458]. The rule is stated in the Restatement of the Law of Agency, sections 13b and 13c, page 46, in part as follows: "A real estate broker whose sole function is to find someone who will enter into a transaction with the owner of land is ordinarily an agent, but the agreement with him may be such that he has no fiduciary duties and hence is not an agent. The facts in each case must be considered in determining whether or not it is understood that the primary obligation of one party is to act for the benefit of the other. . . ."

Applying the above test and looking to the facts here to ascertain the intent of the parties, it is apparent that there was never any intent on the part of Kelly & Son or Rattray to create with Humston a principal-agent relationship. Indeed both testified to a specific intent to avoid creating that relationship by means of taking an option. Rattray confirmed Kelly's testimony in this respect, saying in response to the question, "Then, will you state to the Commissioner why it was you took the option in the name of Kelly & Sons? A. The simple reason that when I got the letter back from Lt. Humston, I listed—my letter with his reply—I took the letter to Mr. Kelly. Mr. Kelly said to me, 'Rattray, the only way I will deal with that man is on option—too much trouble with him in the past.' I therefore made up an option and sent it to Lt. Humston for his signature."

The testimony of Humston as to his intent shows that he

knew that he was making a sale of the property to Kelly and that Kelly would resell it, and that he also knew that the property was being quoted at $15,000 to $13,500 and that Kelly would make a profit, but he erroneously assumed that there was a state law which would limit the profit to the same amount as a 5 per cent commission. Although Humston may originally have believed that he was hiring Rattray as his agent to sell his property at the best price obtainable, he could hardly have continued to so believe after the negotiations concerning a cash deal, when after considerable dickering the cash price of $10,250 was agreed upon.

In short, the evidence shows no more than that one of the parties to the transaction had a specific intent to create a vendor-purchaser relationship, and the other party may have at the inception of the transaction had a vague idea of creating a principal-agent relationship, but abandoned this intent after dealing at arm's length relative to a cash sale. In such circumstances the option agreement must be construed as a pure option, and nothing more.

That Rattray was not guilty of any fraudulent or dishonest dealing is obvious. He procured for Humston the highest cash price obtainable for the property. No person was found who would buy the property on net cash terms for any greater sum or at all. In fact, the only way a sale for cash could be consummated was through the financing efforts of Mr. Kelly, which lay beyond any duty he would have undertaken as a mere selling agent. The regular channels for financing were closed. No standard lending institution would give a $12,500 loan on a $13,500 purchase price, with only a $400 down payment, nor is it customary for selling agents to take a second mortgage. Mr. Kelly himself was unwilling to embark upon so uncertain a deal unless he would stand to make some profit other than a commission; in other words, unless he could make a cheap enough *cash* purchase of the property, he could not afford to take the chance of financing Espey. When he found he could get the property for $10,250, he promptly approached an individual lender, with whom he had been having dealings for more than twenty-five years, and procured from him the $12,500 loan. He stood the expense of the double transfer, and was required to take a second mortgage to secure a portion of the amount which he was to receive for this service. All this was done in order to make a cash deal

for Humston who professed to be satisfied with the sum which he netted.

While persuasive arguments may be advanced against the practice of using options in place of listing agreements in cases of this character, it should be the law that where an option is used and both parties understand the purport of its language, and know that a sale and resale at a profit is contemplated, the relationship is that of vendor and purchaser and not of principal and agent.

The majority opinion fails to give due consideration to the details of the purchase of the property by Kelly for *cash* and the sale of it to Espey who was able to make a down payment of only $400. Humston knew he was selling the property to Kelly for $10,250 net. He was told by Rattray that they would have to do some financing in order to sell the property, which was the truth. He never asked Rattray to advise him as to the purchase price which Kelly received for the property. In fact it was none of his concern. He had received the sum of $10,250 which was agreed upon as the net cash price to him, and he was satisfied. Certainly, in view of these facts the trial court was not compelled to conclude that Rattray was guilty of fraud or dishonest conduct in connection with this transaction. To so hold would be equivalent to saying that if the Real Estate Commissioner had found Rattray not guilty, mandamus would nevertheless lie to compel him to revoke Rattray's license.

The majority opinion contains several statements which are not supported by the record. Said opinion states ''The evidence shows without conflict that plaintiff was employed [by Humston] as a broker.'' The opinion then proceeds with an interpretation of the evidence which is clearly contrary to the views expressed by the trial court thereon. I am convinced that the interpretation placed on the evidence by the trial court is clearly correct.

The opinion states that ''The correspondence initiating the relation between Humston and plaintiff leaves no doubt that plaintiff offered Humston his services as a broker and that Humston retained him in that capacity.'' This statement is incorrect. The original letter from Rattray to Humston, which I have already quoted, contains no statement from which the creation of an agency or fiduciary relationship could be implied. On the contrary, it reads as an offer to purchase,

saying that the firm would be pleased to receive from Humston, "The price and terms acceptable to you, and enclose stamped envelope for your reply." The letter implied, if anything, that the firm was representing a prospective buyer, and would deal with the seller at arm's length.

The second letter to Humston does speak of a "fair price" of $12,000 to which "we would have to add the selling commission presuming that we can arrive at a mutually satisfactory basis," but it obviously makes a loose use of the term "selling commission," without stating the amount of that commission or stating what the "mutually satisfactory basis" would be, and it expressly mentions in two places that an "option" (enclosed for signature) will be required. It also speaks of the prospective buyer as "our client," and makes no reference to Humston as a client.

These letters, considered in the light of the evidence as a whole, clearly give rise to conflicting inferences as to the nature of the relationship between Humston and Kelly & Son, or Rattray. Hence the majority opinion is incorrect in its statement that the letters "show indisputably that plaintiff offered his services and was employed to find a purchaser willing and able to acquire the property for $12,000.00 plus a selling commission to plaintiff." Furthermore, even if a selling commission were contemplated there is nothing whatsoever limiting or fixing the amount of that commission. Plaintiff's statement, quoted in the majority opinion, that his purpose was to get a listing or authority to sell the property makes no concession respecting the terms of the listing.

The opinion states that the "evidence also shows without conflict that once plaintiff was employed by Humston he reported to him as a broker does to his principal." This is but the conclusion of the author of the opinion. The inference drawn by the trial judge, and it is a reasonable inference, is to the contrary. At no point does the correspondence between Humston and Rattray, or their testimony as to telephone and personal conversations, show other than that they were negotiating to arrive at a price at which Humston would be willing to sell, a cash price.

Next the opinion states that the "evidence also shows without conflict that after plaintiff secured a purchaser for the property he violated his fiduciary duties as a broker and by untruthful and misleading statements induced his principal to reduce the price placed upon the property and to sell it to

plaintiff's firm.'' This again is but the conclusion of the author of the opinion. The evidence, in my opinion and in that of the trial judge, shows no fiduciary relationship. Obviously, there was no misleading or untruthful statement made by Rattray to Humston. He told Humston, and truthfully so, that the price Humston was demanding was so high that no cash buyer could be found; he told Humston about advertising the property as high as $15,000; he told him of a prospective buyer who would have to have help in financing. Mr. Kelly was not willing to arrange this financing unless he himself could buy the property in for cash at a low enough price. It is also uncontradicted that Rattray truthfully told Espey of the financing difficulty. Any sensible man would have realized that a $400 down payment is not sufficient to finance a $13,500 purchase through any of the ordinary commercial financing channels such as banks and other lending institutions.

Mr. Espey testified: ''He [Rattray] told me that day [sometime before April 1st] that there would be some doubt because of the smallness of the down payment whether they would be able to finance the deal, so I went home that night and sat down and figured approximately for the purchase, showing what I would be able to pay, that would be taking the rentals from the property I own and the rentals on this. . . . I am not sure of dates again, but a week or more later that I spoke to him [Rattray]. He told me then he had not been able to get Mr. Humston to reconsider the price he was asking for the property and some doubt as to whether or not he would be able to let me have the property for $13,000, and suggested I leave the matter in his hands, and also said some difficulty with financing—might be a task in order to finance the advance interest in order to get the loan through a private party, so I left the matter in that way.''

At this point in the negotiations, the record shows without conflict that if a sale was to be made to Espey it could only be through procuring someone who would give a private loan. Mr. Kelly and Mr. Simon of his office were able to make arrangements to borrow $12,500 from one Ceccarelli. Espey could not obtain any loan on the property at all because of the small amount of cash which he had; he could not make the purchase at all without financing aid afforded by Mr. Kelly.

The basic misconception of the majority opinion is its failure to recognize that in the profit made by Mr. Kelly on the two transactions there was no overreaching of Humston. The evi-

dence not only supports the trial judge's conclusion to this effect; it shows that no other conclusion is possible. Rattray was unable to effect any sale for cash for more than the $10,250; Humston would only accept cash. Rattray could not even effect the $10,250 cash sale until he found some channel through which a resale might be made by Mr. Kelly. Humston's erroneous belief that the profit on a transaction of this kind, or on any sale of real estate by an agent, is limited to a selling commission of 5 per cent was not known to Rattray. There is no law fixing the commission which an agent may charge at 5 per cent and no more. In fact the custom of charging not less than 5 per cent is more to protect brokers from under-cutting than it is to establish a customary maximum rate. Furthermore, services rendered in financing are not performed gratis, but are generally compensated by a commission. Humston admitted that he never offered Rattray any commission whatsoever, and also that he knew he was selling to Kelly and that a resale was contemplated. When he met Espey he did not even ask him how much he paid for the property. On this point he testified: ''I thought Kelly & Son was making the deal for me—that it was all right. Why should I go around and ask somebody about the deal or how much they sold it for. I had confidence in Kelly & Son that they had made a satisfactory deal. Q. Why didn't you at any time ask Mr. Espey what price he had paid for the property? A. That is the only time I ever talked to him—no reason why I should have. . . . Q. Now, did you at any time ever ask Mr. Kelly or Mr. Rattray what their transaction was with Mr. Espey? A. No. Q. Did you ever at any time ask Mr. Kelly or Mr. Rattray to refund to you the portion of the profit that they made on your transaction? A. I never. Q. Did you ever at any time ever offer to pay Mr. Kelly or Mr. Rattray any commission for the handling of this transaction? A. I never.'' Furthermore, according to Rattray, Humston said to him after the sale: ''I don't know what you folks got out of it, but I am satisfied with it. . . .'' Likewise Espey never offered to pay a commission for either the selling or the financing.

The majority opinion implies that there was some chicanery by reason of the fact that the deals were ''completed in the same escrow.'' All that the record shows in this respect is that the title company gave the same escrow number to both transactions. However, two separate sales were effectuated and the expenses were paid by Mr. Kelly. It was not until April 16th,

after the option expired, that Espey put his $400 in escrow. Each of the parties gave separate escrow instructions, and it took over a month for the completion of all details. It is immaterial that Mr. Kelly used the proceeds of the $12,500 loan for his payment to Humston, for he himself procured that loan; it was not procured by Espey, or from Espey.

The statement in the majority opinion that "in the light of the uncontradicted documents and plaintiff's own testimony, it cannot be questioned that plaintiff violated the fiduciary duties of a real estate agent . . . ," is but a conclusion of the writer, for no fiduciary or agency relationship was established. If such a relationship had been established, or more specifically, if the trial judge had chosen to infer that such a relationship existed, then the cases cited in the majority opinion would be in point, particularly those relating to the necessity of a full disclosure. As the record stands, they are inapplicable. No mention is made of the cases hereinabove cited, which support the holding here announced.

The conclusion, "Nor could plaintiff have any doubt that had Humston known this fact [that Espey was purchasing for $13,500], he would not have sold the property to Kelly & Son," and that "He [Rattray] not only failed to disclose the truth but made the misrepresentation that he was unable to sell the property at the price placed upon it by Humston," simply ignores the uncontradicted fact that Humston did know that a resale was contemplated, and that a higher price was being asked, and that it was the truth that the property could not be sold *for cash* for more than the price paid Humston.

The majority statement, "The findings of the trial court that there was no evidence that plaintiff was acting as Humston's agent is so clearly inconsistent with the documentary evidence as well as plaintiff's own testimony that it can be explained only as being based upon the theory that, since plaintiff's firm had an option to purchase and did purchase the property, plaintiff could deal with Humston at arm's length and was not bound by any fiduciary duties," is not justified. As already stated, the evidence bearing on the question whether there was an agency or fiduciary relationship is susceptible of conflicting inferences and the inferences drawn by the trial court are justifiable, reasonable, and conclusive. It is true, as the majority opinion goes on to say, that a broker can be given an option which runs "concurrent with the agency," and in such case there is a fiduciary relation, and a duty of

full disclosure. But here there is sufficient support for the conclusion that an option only was given; there was no agency. The cases cited in the majority opinion are therefore not controlling.

The majority opinion then states that ''The fact that Espey had only $400.00 cash and that therefore the greater part of the purchase price had to be covered by a loan affords no excuse for plaintiff's conduct. From the standpoint of the seller Espey was as much a cash buyer as one who did not need a loan. It was immaterial to Humston whether the cash came from the purchaser's own funds or whether he had to secure it from a lender. Since Kelly & Son's sale to Espey resulted in the receipt of approximately $12,800.00 cash it is clear that Humston would have gained more from a sale to Espey than the one to Kelly & Son.'' This statement again shows the basic misconception of the author. From the standpoint of the seller, Espey was not even a prospect, for he had no cash to pay. There was nothing in plaintiff's conduct to excuse. He truthfully disclosed to Humston that he was to sell to Kelly, and that some financing would have to be done for the next purchaser, and Humston understood that Rattray's remuneration would come out of whatever profit was made on the resale. The only thing that aroused Humston's ire was that the profit was more than the 5 per cent which he erroneously may have inferred it would be. He has never claimed he did not receive the full cash price to which he agreed.

It may be noted too that Kelly did not in fact consummate his purchase until the option (or listing, if it be denominated as such) had expired. Instead of receiving $10,000 cash and $2,000 on a deferred payment as provided in the option, Humston received $10,250 as the full purchase price of the property. There is no uncertainty as to this agreement. It was the subject of a telephone conversation between Rattray and Humston, and confirmed by Humston by wire. At the time this agreement was made, no purchaser had been found who would pay $10,000 cash for the property except Kelly who was able to finance the resale of the property. From these facts the trial court concluded that Rattray was not acting in the capacity of agent or broker for Humston but was acting for and on behalf of Kelly who was the purchaser of the property.

By reversing the judgment of the trial court in this case the majority of this court disregard all conflicts in the evidence

and draw all inferences and deductions from the evidence adverse to plaintiff. The rule that all intendments are in favor of the judgment of the trial court and that all reasonable inferences and deductions should be drawn from the evidence in support of the judgment is entirely disregarded. This rule has been so clearly and forcibly stated in two recent decisions of this court that I cannot refrain from quoting from the majority opinions therein. In the *Estate of Bristol,* 23 Cal.2d 221, 223 [143 P.2d 689], the court said: "The rules of evidence, the weight to be accorded to the evidence, and the province of a reviewing court, are the same in a will contest as in any other civil case. (*Estate of Snowball* (1910), 157 Cal. 301, 305 [107 P. 598]; *Estate of Barr* (1924), 69 Cal.App. 16, 33 [230 P. 181].) The rule as to our province is: 'In reviewing the evidence . . . all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary . . . principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any *substantial* evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.' (Italics added.) (*Crawford* v. *Southern Pacific Co.* (1935), 3 Cal.2d 427, 429 [45 P.2d 183].) The rule quoted is as applicable in reviewing the findings of a judge as it is when considering a jury's verdict. The critical word in the definition is *'substantial';* it is a door which can lead as readily to abuse as to practical or enlightened justice. It is common knowledge among judges and lawyers that many cases are determined to the entire satisfaction of trial judges or juries, on their factual issues, by evidence which is overwhelming in its persuasiveness but which may appear relatively unsubstantial—if it can be reflected at all—in a phonographic record. Appellate courts, therefore, if there be any reasonable doubt as to the sufficiency of the evidence to sustain a finding, should resolve that doubt in favor of the finding; and in searching the record and exploring the inferences which may arise from what is found there, to discover whether such doubt or conflict exists, the court should be realistic and practical. Upon such view of the law we cannot hold that any essential finding in this case is unsupported."

In the *Estate of Rule*, 25 Cal.2d 1 [152 P.2d 1003, 155 A.L.R. 1319], which involved the interpretation of a contract for the payment of a commission to a real estate broker, this court said at page 10: "The fact is, however, that the trial court had before it and undoubtedly *did* consider evidence of the surrounding circumstances, including the Brownscombe letter, and yet determined that respondent broker was entitled to his earned commission. And, in the absence of findings of fact and conclusions of law, every intendment is in favor of the judgment or order appealed from and it is presumed that every fact or inference essential to the support of the order and warranted by the evidence was found by the court. (See *Haime* v. *de Beaulieu* (1942), 20 Cal.2d 849, 852 [129 P.2d 345] ; *Bekins Van Lines, Inc.* v. *Johnson* (1942), 21 Cal.2d 135, 137 [130 P.2d 421] ; *Estate of Shaw* (1927), 85 Cal.App. 518, 525 [260 P. 351] ; 2 Cal.Jur. 852, § 499; 10 Cal.Jur. 741, § 62.) Whether, in the light of the conflicting inferences to be drawn from the evidence, the parties by their contract intended to provide for the payment to respondent of a commission for his past services—which had not yet matured into a confirmed sale and which, hence, in one sense, were services in course of rendition—in securing Willig as a bidder and prospective purchaser, or contemplated payment for future services only, was for the determination of the trial court and its decision may not be interfered with by us on appeal. The rule is that an 'appellate court will accept or adhere to the interpretation [of a contract] adopted by the trial court—and not substitute another of its own— . . . where parol evidence was introduced in aid of its interpretation, and such evidence . . . is such that conflicting inferences may be drawn therefrom.' (4 Cal.Jur. 10-Yr.Supp. (1943 rev.) 146-147, § 192; see also 2 Cal.Jur. 934-939, § 549.) Certainly inferences may be drawn from the contract and the surrounding circumstances here which would support the finding which we must presume was made by the trial court relative to the intention of the contracting parties."

The circumstance that the trial court in the case at bar had before it only a transcript of the proceedings and evidence taken before the Real Estate Commissioner does not change the rule with respect to the function of the trial court in determining the facts, as it cannot be questioned that under our system of jurisprudence the trial court is the forum for the determination of issues of fact whether those issues are

presented by way of written or oral testimony or by ocular observation. If such were not the case, we would have a different rule with respect to evidence submitted in the form of deposition or affidavit than that received in the form of oral testimony and ocular observation. It is clear that under all of the authorities the function of the trial court in the determination of the facts is the same regardless of the form in which the evidence is presented.

In my opinion there is clear, positive, convincing and substantial evidence in the record in this case to support the findings of the trial court and the judgment based thereon should be affirmed.

Shenk, J., and Schauer, J., concurred.

Respondent's petition for a rehearing was denied June 18, 1946.

Shenk, J., Carter, J., and Schauer, J., voted for a rehearing.