NOLAN, Respondent, vs. WISCONSIN REAL ESTATE BROKERS' BOARD, Appellant. [Five cases, Nos. 217 to 220, and 249.]

*March 4—April 8, 1958.*

For the appellant there was a brief by the *Attorney General* and *Warren H. Resh, Harold H. Persons,* and *Robert J. Vergeront,* assistant attorneys general, and oral argument by *Mr. Vergeront* and *Mr. Resh.*

For the respondent Kenneth R. Nolan there was a brief and oral argument by *Albert R. Franz* of Milwaukee.

For the respondent Frank Alexander Elko there was a brief by *Frank, Karl, Bessman & Hiller* of Milwaukee, and oral argument by *Leonard Bessman.*

For the respondent Edward F. Sisolak there was a brief and oral argument by *James G. Sisolak* of Milwaukee.

For the respondent Clement Winzenburg there was a brief and oral argument by *John J. Tyson, Jr.,* of Elm Grove.

For the respondent John A. Horning there was a brief and oral argument by *William F. Scholl,* attorney, and *Mark M. Camp* of counsel, both of Milwaukee.

CURRIE, J. Counsel for the five respondents contend that the order of the board revoking or suspending the respondents' licenses is void by reason of failure of the board to comply with statutory procedural requirements in instituting the proceedings against the respondents.

The first defect raised is that no formal complaint was entered or served upon the respondents as provided by sec. 136.08 (4), Stats., and sec. 3.01 (2) of the rules of the board as set forth in vol. 5 of the Wisconsin Administrative Code. This argument seems to overlook the provisions of sub. (2) of sec. 136.08, which provides two alternative methods for the institution of disciplinary proceedings by the board, in only one of which is a complaint required. Such subsection provides: "The board may also on its own motion, or upon complaint in writing, duly signed and verified by the complainant, and upon not less than ten days' notice to the broker or salesman, suspend any broker's or salesman's license if it has reason to believe, and may revoke such license as provided hereafter, if it finds that the holder of such license has" committed any of the thereinafter-described acts. Sub. (4) of sec. 136.08, which provides for service of the complaint upon the accused broker or salesman, is interpreted to only apply to a situation where the board is proceeding

upon a complaint of a third party, and not to a situation where, as here, the board has proceeded upon its own motion.

We also do not construe sec. 3.01 (2) [1] of the board's rules as requiring it to file a complaint with itself in the situation where the board has initiated the proceedings upon its own motion. The words *"by a formal complaint,"* which appear in paragraph (b) of such rule, refer only to the situation where a third-party complainant has failed to initiate the proceedings, and not to one where the board has instituted the proceedings of its own motion.

The second procedural defect raised is that the notice of hearing was insufficient under the applicable statutes, and the due-process clause of the Fourteenth amendment, to apprise respondents of the grounds for possible suspension or revocation of their licenses. Such applicable statutes are secs. 136.08 (2), 136.09, and 227.09. The pertinent provisions of sec. 136.08 (2) have hereinbefore been quoted verbatim. Sec. 136.09 prohibits the board from revoking a broker's or salesman's license without first conducting a public hearing in the matter. Such statute also requires the board to send written notice of the time and place of hearing to such broker or salesman, and his attorney or agent of

---

[1] Sec. 3.01 (2), Wisconsin Real Estate Brokers' Board Rules, reads as follows: "(2) INSTITUTION. (a) *By individual.* Proceedings going to the revocation or suspension of licenses shall be initiated on complaint verified by an individual or his representative. Proceedings requesting the promulgation, amendment, or repeal of any rules of the board shall be initiated on petition verified by an individual or his representative.

"(b) *By board.* The board may in its discretion initiate proceedings to revoke, or suspend a license whenever an investigation by the board or its employees, discloses probable grounds therefor or in the event a complainant fails to proceed to initiate proceedings pursuant to chapter 136 Wis. Stats., by a formal complaint, provided that no hearing shall be initiated on the board's own motion until a resolution duly authorizing the same has been recommended by the board."

record, at least ten days prior to the date of hearing. Sec. 227.09 provides, "Every party to a contested case [before an administrative agency] shall be given a clear and concise statement of the issues involved."

We are of the opinion, and so hold, that the portions of the notice of hearing, which are quoted in the statement-of-facts portion of this opinion, were sufficient to apprise at least the respondents Elko and Nolan of the nature of the grounds for suspending or revoking their licenses to be considered at the hearing. We also determine that such notice did constitute due process of law under the Fourteenth amendment as to Elko and Nolan. This court has some doubt as to whether such notice was sufficiently specific to advise some of the other respondents as to the nature of the charges against them. We do not pass on the sufficiency of the notice as to such other respondents because of the disposition that we make of their cases. However, we deem it essential that, where the board initiates on its own motion disciplinary proceedings against brokers or salesmen, the notice of hearing spell out the specific nature of the charges of misconduct to be considered against each respondent.

Having disposed of the alleged procedural defects, we will now consider the merits of the controversy. This issue essentially boils down to the question of whether there is substantial evidence in the record to support the board's findings of fact of improper conduct or incompetence on the part of respondents. In passing on this issue we deem it advisable to first set forth a resumé of the material facts adduced at the hearing before the board.

Michael Sipusich (hereinafter referred to as "Sipusich") was born September 24, 1885, and Barbara Sipusich, his wife, is four years younger. The Sipusichs are Croatians. Sipusich has a fair understanding of the English language when spoken, but testified once that he could not read English "well," and another time that he could not read it

at all. Mrs. Sipusich has difficulty understanding such language. It is customary, when the Sipusichs are addressed in English, for Sipusich to translate what is said into Croatian so that Mrs. Sipusich will understand it.

Their apartment house, herein previously referred to, is constructed of brick and is in good condition. Each of the eight apartments has its own separate heating plant, most of which heating plants are gas-fired, and its own hot-water system. Seven of the apartments bring in a total gross aggregate rental of $375 per month and the eighth apartment is occupied by the Sipusichs. The factor which tends to depreciate the value of this property is that the surrounding neighborhood is changing for the worse.

Prior to the Sipusichs listing their apartment house for sale with the Wauwatosa Realty Company they had listed the same with one Lehn, a licensed real-estate broker. Such prior listing ran from August, 1955, to January, 1956. Lehn received offers to purchase from two different parties.

One Krasno offered $27,500 for the property with a $5,000 down payment. Krasno could not secure financing for the difference, and the only way the purchase could have been made was for the Sipusichs to accept a second mortgage for the difference between whatever first mortgage on the property Krasno could obtain and the $22,500 balance. The Sipusichs rejected the offer because they were unwilling to take a second mortgage.

The second offer received by Lehn was from one Wutke. His written offer dated January 19, 1956, was received in evidence. The purchase price was $29,000, but the offer was subject to the conditions that Wutke sell a property owned by him by March 30, 1956, and that he be able to secure a first mortgage on the Sipusich property of $19,000. The first condition was met as Lehn was able to sell Wutke's property for him. However, the deal with the Sipusichs fell through because the largest amount for which he could

procure a first mortgage on the Sipusich property was either $17,000 or $17,500. The Sipusichs refused to accept even a $1,500 second mortgage from Wutke to enable him to purchase the property for $29,000. The Sipusichs informed Lehn that they would not accept a second mortgage in any amount.

After the Lehn listing expired, Elko persuaded the Sipusichs to list the property with Wauwatosa Realty Company. Elko received several offers considerably lower than the listing price of $29,000, which the owners rejected. One of such rejected offers was in the sum of $20,000 and involved the Sipusichs taking back a $5,000 second mortgage. Sipusich informed Elko that he was not interested in any second mortgage.

Jack Goldman, an attorney and licensed real-estate broker, became interested in purchasing the property. He finally made a verbal offer to purchase to Elko upon the following conditions: The Sipusichs to deed the property to him and he would place a mortgage of $15,000 thereon and then deed it back, the $15,000 mortgage proceeds to be paid to the Sipusichs; the property would then be conveyed back to the Sipusichs subject to the mortgage; Goldman would then enter into a land contract to purchase the owners' equity for $10,000, payable in instalments of $60 per month to cover principal and interest on the unpaid balance at four per cent per annum; and the term of the land contract was to be ten years, but, if Goldman at the end of the ten years was unable to refinance the unpaid balance, the term of the contract was to be extended until he could. The Sipusichs lived in one of the eight apartments and the offer permitted them to continue to reside therein for ninety days at an occupancy charge of two dollars per day.

Elko requested his fellow salesman, Nolan, to type up Goldman's offer to purchase by filling in the blanks of a printed offer-to-purchase form with the details of Goldman's

verbal offer. Such offer was typed in triplicate by Nolan and was signed by Goldman. Elko then submitted the offer to his office manager, Mott. Because of the unusual nature of the deal, Mott deemed it advisable to contact the company's chief attorney, Winzenburg, which was done by phone. Mott then reported to Elko that Winzenburg's instructions were to make sure that the sellers understood the terms of the offer.

Elko submitted the Goldman offer to the Sipusichs at their apartment, Tuesday or Wednesday, May 29th or 30th. In the conversation with Sipusich, Elko made the statement that Goldman owned three separate properties of his own. Sipusich's understanding of the conversation was that Goldman was to place the $15,000 mortgage on Goldman's separate properties, and did not comprehend that it was to be placed on the Sipusich apartment house. However, Sipusich did not directly testify that Elko made any misrepresentations of fact in such conversation. Sipusich rejected the Goldman offer and raised three objections to it. The first was that he wanted $25,000 net after payment of the brokerage commission. The second was that the two-dollar per day occupancy charge was excessive and ought to be reduced to one dollar and fifty cents per day. Thirdly, he thought the interest rate on the $10,000 unpaid balance should be five per cent per annum instead of four per cent. Goldman, upon being contacted by Elko, refused to raise his offer.

On Thursday, May 31st, Nolan asked Elko about the status of the deal and was told what had transpired. Nolan then stated that he would be interested in purchasing the Sipusich property at a price of $26,300, which would be sufficient to net the owners $25,000 after deducting the commission. Nolan then proceeded to type out in triplicate his own offer to purchase. In doing so, he copied the Goldman offer except for the price and the balance for which the land contract was to be given. He inserted $26,300 for the first

figure and $11,300 for the second. Nolan submitted such offer without ever having inspected the property. The company's listing data, however, described the property in some detail and set forth the rentals being received by the Sipusichs. Nolan relied largely upon a computation of projected income and expenses which he made. This computation disclosed that after deducting all expenses, the amortization of the principal payments on both the first mortgage and land contract, and a vacancy allowance of five per cent, there would remain a net balance of $20.37 per month. In other words, Nolan figured he could pay for the property out of income without investing a cent of his own money.

Under the company's rules, known to Elko and Nolan, any written offer to purchase on the part of a company employee was required to state therein that the person making such offer was such employee. The excuse given for violating this rule was that there was not space enough in the printed form for typing in the required statement. However, a duplicate copy of the Nolan offer was received in evidence. This discloses that there were nine blank lines at the end of the offer form, which were located just above the date of "May 31, 1956," and in which nothing was typed or written.

Elko submitted the Nolan offer to Mott who again consulted Winzenburg. Winzenburg informed Mott that the offer would have to be submitted on the basis that, if the sellers did not understand the deal, they were to be accorded the option to cancel. In order to make sure that the sellers understood the deal, and that their right to cancel was protected, Winzenburg also instructed Mott that the deal be sent to Winzenburg for closing because Winzenburg wanted to see the sellers. These instructions were given over telephone and Winzenburg had not at that time seen the Nolan offer.

That same day, May 31st, Elko took the three copies of the Nolan offer to the Sipusich apartment and submitted

the same. Elko testified that he told them that the purchaser Nolan was a salesman employed by the company. If this was said, it is apparent from Sipusich's testimony that he did not comprehend it. This is because Sipusich testified with respect to his understanding of the $26,300 deal that the $15,000 mortgage was to be placed on the purchaser's three properties and not the apartment house. This indicates that he was not aware that the $26,300 offer was from a different prospective purchaser than the $25,000 offer submitted a day or two before, because it was Goldman and not Nolan who owned the three properties.

Sipusich objected again to the two-dollar per day occupancy charge and the four per cent interest rate payable on the portion of the purchase price to be financed by land contract. Elko by use of a pen changed the two-dollars occupancy charge to one dollar and fifty cents, and the interest rate from four per cent to five per cent. The Sipusichs then affixed their signatures to the acceptance portion of the three copies of the offer of purchase. Nolan testified that he later initialed on the seller's copy of the offer the two pen-and-ink changes made by Elko therein. However, Nolan never accompanied Elko to the Sipusich apartment, and one of the triplicate originals of such offer, which was received in evidence as Exhibit 5, is not so initialed.

At this same time Sipusich turned over his abstract of title to Elko to enable the purchaser to check the title, and Elko wrote a receipt for the same on the back of the seller's copy of the offer, and the same appears on Exhibit 5. Nolan then used the abstract to obtain a legal description of the property, and turned such description over to his own attorney and directed that a warranty deed be drafted from the Sipusichs to Nolan and wife. This deed was then turned over by Nolan to Elko for the purpose of having the Sipusichs execute it.

Elko took this warranty deed to the Sipusich apartment on Saturday morning, June 2d. He had previously arranged with another fellow salesman, the respondent Sisolak, to come to the apartment and explain the transaction to the Sipusichs in the Czecho-Slovak language, and to act as notary in taking the Sipusichs' acknowledgment of the deed. After arriving at the apartment, Elko phoned Sisolak and the latter then came in response to such call. There is a discrepancy in the testimony as to what occurred at the apartment that morning. Elko and Sisolak testified that the deed was signed after such arrival, while Sipusich testified that the signing occurred prior thereto. Sisolak testified that he explained the entire transaction in the Czecho-Slovak language to the Sipusichs and that Sipusichs understood such explanation. On the other hand, Sipusich testified that Sisolak talked to the Sipusichs in the Czecho-Slovak language but that he (Sipusich) was unable to understand what Sisolak said in that tongue. It is apparent from the testimony that Sipusich then trusted Elko and would sign any instrument the latter requested him so to do.

Elko testified that after receiving the executed deed from the Sipusichs he put it in his pocket and said, *"Mike, this deed will not be delivered to the buyer."* Upon returning to the company office that Saturday morning Elko, contrary to the promise made to Sipusich, turned the executed deed over to Nolan. Elko's explanation for so doing was that he was unable to lock his own desk, and requested Nolan to lock the same in the latter's desk for safekeeping over the week end.

The next day, Sunday, June 3d, Sipusich submitted his executed copy of Nolan's offer to purchase to his attorney, Jack Kaiman. When Kaiman then informed Sipusich, that this offer called for the $15,000 mortgage being placed on Sipusich's own property, the latter was greatly surprised and shocked. That same Sunday evening, Sipusich telephoned

Elko that Sipusich's lawyer had advised Sipusich that the deal was "no good." Sipusich requested that all papers be returned to him, and Elko reached Kaiman by phone and Kaiman severely criticized the details of the Nolan deal. Elko told Kaiman that Nolan had the deed and the "Title Company" had the abstract. Kaiman demanded that Elko get possession of such instruments and deliver them to Kaiman. Kaiman had learned that Nolan was a salesman of the company as a result of looking Nolan up in a directory, and not from any information given by Sipusich.

On this Monday, June 4th, Elko telephoned to Winzenburg that Kaiman was attorney for the Sipusichs. The company's file on the transaction had then been received by Winzenburg pursuant to his prior instructions to Mott. Winzenburg observed from the Nolan offer to purchase that Winzenburg's instructions, that the offer state that the sellers be given the option to cancel if they did not understand the deal, had not been carried out. He then telephoned Nolan who informed him that the deal had been made subject to such understanding, but Nolan remained silent about having already obtained the warranty deed. Winzenburg also made several unsuccessful attempts that day to reach Kaiman by phone. Winzenburg then wrote the following letter to Kaiman:

"Re: Mike Sipusich<br>226 W. Vine Street

"The above file has been referred to me, with the information that you represent the seller. I tried to reach you several times today by telephone regarding this matter, but was unable to locate you.

"In view of the peculiar conditions stated in the buyer's offer, it is understood by him that the sellers' acceptance of the offer is subject to cancellation if the seller does not fully understand the terms thereof and desires to cancel the deal. Hence, I am glad to know that the sellers have an attorney

for now the sellers should be able to come to a speedy decision as to whether they want to retain or cancel the deal.

"Please contact me promptly."

Elko on this same June 4th informed Nolan that Sipusichs' attorney had raised an objection to the deal. Nolan, instead of turning the deed over to the company, took all of his papers, including the deed, and put them in a folder and delivered that folder to his own attorney, Albert R. Franz. Franz advised Nolan to cancel the deal if any question was going to be raised by the Sipusichs.

On June 6th, Kaiman wrote a letter to Winzenburg in reply to the latter's letter of June 4th, which letter is as follows:

"In reply to your letter, this is to advise you that Mr. Sipusich was told that the buyer would give the seller $15,000, which said buyer would raise by way of a mortgage on 3 parcels of property owned by said buyer.

"Mr. & Mrs. Sipusich are elderly people and do not know the difference between a land contract, deed, and offer to purchase. They are of foreign birth and do not know English too well, and they would never consent to give away their life savings to anyone on such terms as set forth in the offer to purchase.

"My investigation further shows that Kenneth R. Nolan as well as Frank Elko are licensed real-estate salesmen in the employ of the Wauwatosa Realty Co.

"In view of the nature of said facts, please return to me the following forthwith:

"1. Offer to purchase, all copies.

"2. Deed.

"3. Abstract of title to said premises.

"4. Listing contract.

"I will be at my office between the hours of 12:30 to 1:30 p. m. waiting for the four (4) items above mentioned."

Winzenburg received such letter on June 7th, and from it learned for the first time of the obtaining of the deed from the Sipusichs. He was greatly angered to learn this and

called in Elko and severely reprimanded him for having procured the execution of such deed. Winzenburg required Nolan to deliver over the deed to Winzenburg, which was done. Winzenburg then scratched out the signatures and legal description with pen and ink and wrote *"Void"* across the face of the deed in large letters. On the same day, June 7th, Winzenburg wrote Kaiman this further letter:

"When I wrote to you on June 4th, I did not know that your clients had executed a deed. This was done without my knowledge or consent. It has now been turned over to me, and I have sufficiently voided it so that it cannot be used. I will see that it is returned to you, when I am able to find out when you are available to receive it, although I prefer to wait until I have located the abstract so that it can be returned to you at the same time.

"Respecting your request for the return of the listing, I do not know the terms of it (expiration date, etc.), and further it is not for me to make the determination when the return of a listing is requested. When I have more information regarding the listing and as to whether it will be canceled, I will let you know."

Winzenburg over a number of days made several unsuccessful efforts to reach Kaiman by phone. Finally, on June 18th, Winzenburg did converse with Kaiman over the phone and arranged for the return of the offer to purchase, deed, and abstract to Kaiman at his office that day. He then instructed Elko to do so. Instead Elko, unknown to Winzenburg, delivered these papers personally to Sipusich on June 19th and took his receipt therefor. Elko testified that he had endeavored to reach Kaiman by telephone on the 18th after receiving Winzenburg's instructions, but had been unable to do so.

On June 22d, the previously referred to letter from the board to Horning was received and perused by Winzenburg. This was the first he knew that Elko had delivered the papers directly to Sipusich in disregard of the instructions

to deliver them to Kaiman. Such letter also recommended that a deed be obtained from the Nolans to the Sipusichs conveying back the premises. Winzenburg immediately, that same day, wrote to Kaiman explaining that the papers had been delivered by Elko directly to the Sipusichs, instead of to Kaiman, contrary to Winzenburg's instructions and without his knowledge. He also undertook to secure a deed from the Nolans, if Kaiman should request it. A quitclaim deed was obtained from the Nolans through Winzenburg's efforts and delivered to Kaiman. The listing contract was also returned.

If the sale by the Sipusichs to Nolan had been consummated, Elko, under company practices, would have received half of the commission and the other half would have been retained by the company. The respondents Nolan, Winzenburg, and Sisolak would not have personally shared in the commission.

In the light of this rather detailed synopsis of the evidence, we will now consider the findings of fact and conclusions of law of the board as applicable to each respondent, and state our conclusion with respect to the determination to be made in each of the five cases.

*Frank Alexander Elko (Case No. 218).*

We have carefully examined each of the board's findings of fact made with respect to Elko's acts and omissions and find all are either directly supported by evidence, or constitute reasonable inferences which the board was entitled to make from evidence in the record, except findings Nos. 4, 5, 6, 7, and a portion of 17. The first four of such findings read as follows:

"4. That in presenting the Nolan offer to the Sipusichs, the agent Frank Elko represented to sellers that the buyer Nolan would raise the $15,000 down payment on the proposed land contract from the proceeds of a mortgage loan to

Nolan secured by a lien on Nolan's separate estate; that the representation was intentionally made by Elko with the expectation that the Sipusichs would rely thereon and said representation was substantial and material;

"5. That the Sipusichs did rely on said representations;

"6. That said representations were false;

"7. That in submitting the Nolan offer to Sipusichs the agent Elko misled Sipusichs by representing the terms of the offer to be different from and contrary to the actual terms and conditions offered by Nolan;"

The board had the right to reject as untrue any testimony given by either Elko or Nolan because of the improbability of certain of their testimony. However, the rejection of any of Elko's testimony does not have the effect of proving the converse of that to which he testified. Elko did not testify that he made the misrepresentations set forth in findings Nos. 4 and 7, and there is no competent evidence in the record that such misrepresentations were made. For some unknown reason, Sipusich was not questioned as to what Elko told Sipusich at the time of the submission of the Nolan offer, and gave no testimony on this point. As previously pointed out, we are satisfied that Sipusich did not understand, prior to his consulting Kaiman, that the $15,000 mortgage was to be placed on his own property. However, the record does not establish that this misunderstanding was due to any misrepresentation made by Elko.

Finding No. 17 reads as follows:

"17. That in obtaining the abstract of title to the property, the agent Elko failed to advise the Sipusichs the true reason for procuring the abstract which was to enable Nolan to place a mortgage on the property *and falsely represented that the abstract was needed only for reason of determining merchantable title in seller.*" (Italics supplied.)

We find that the italicized portion of the above finding is also not supported by the record. As we read Sipusich's

testimony, Sipusich was the one who suggested that Elko take the abstract so that the title might be checked. The reason advanced by Sipusich for so doing was that Lehn had required possession of the abstract for the purpose of checking title when Lehn had the listing of the property.

The findings of fact with respect to Elko, which we do find are supported by credible evidence, are as follows:

"8. That in inducing the acceptance of the Nolan offer to purchase, by the sellers Sipusichs, the agent Elko did not represent the true and real means by which the buyer would secure the down payment on the proposed land contract which was by securing a mortgage on the seller's own property, the same property which was to be the subject of the land contract;

"9. That the acts and representations of the agent Elko in preparing, presenting, submitting, and inducing the acceptance of the Nolan offer to purchase were pursuant to the listing contract dated May 1, 1956, between the respondent realty company and the Sipusichs and while acting as the agent of the respondent realty company;

"10. That prior to submitting the Goldman and Nolan offers to the sellers' agent, Elko was advised by Mr. Mott that Mr. Winzenburg stated the offer was all right but to make sure the sellers understand it;

"11. That in presenting the Nolan offer to the Sipusichs, the agent Elko failed to identify the buyer Nolan to the sellers Sipusichs as an employee of the listing brokerage company;

"12. That the respondent Clement Winzenburg knew the terms of the offer and instructed the salesmen to make sure the buyer understood and further that he wanted to be kept advised of the progress of the transaction. . . .

"13. That in submitting the Nolan offer with the same objectionable interest rate and occupancy charge, as in the Goldman offer, respondent Nolan and respondent Elko ignored the sellers' interests and desires.

"14. That it was the purpose and object of the respondent Elko and the respondent Nolan to pursue a common course of effectuating a sale and purchase of the Sipusich property

beyond the usual collaboration between the agent of the seller on the one hand and the buyer on the other.

"15. That the respondent Elko in procuring the deed and abstract acted as agent for respondent Nolan as well as agent for the respondent company, without the knowledge of the Sipusichs.

"16. That the acts and representations of the agent Elko in securing the abstract of the Sipusichs' property from the Sipusichs were performed and made during the existence of the listing contract, and pursuant to it and while acting as the agent of the respondent realty company and each of its officers. . . .

"21. That the delivery of the deed by Sipusichs to the respondent Elko was not intended to be contingent or conditional but was intended by Elko through persuasion by deceit to obtain a conveyance of all right, title, and interest of Sipusichs in the premises so that respondent Nolan could secure the necessary mortgage.

"22. That the acts and representations of the agent Elko in securing the warranty deed from the Sipusichs were performed and made during the existence of the listing contract, and pursuant to it and while acting as the agent of the respondent realty company and its officers.

"23. That respondent Elko after assuring the Sipusichs that the deed would not be delivered to the buyer handed the deed to respondent Nolan in order that Nolan might secure the necessary mortgage.

"24. That in their consideration and acceptance of the Nolan offer and in their execution and delivery of the deed and in their delivery of the abstract, the sellers reposed trust and confidence in the acts and representations of the respondent Elko. . . .

"26. That respondents Nolan and Elko ignored the instructions given to them by Mr. Winzenburg through Mr. Mott with respect to the handling of this transaction and respondent Nolan ignored the company procedure in delivering the deed to his attorney."

We are permitting finding No. 21 to stand, wherein it was found that Elko procured the deed from the Sipusichs "by

deceit," because of Elko's promise to them that the deed would not be delivered to Nolan.

The board's conclusions of law applicable to Elko are Nos. 3, 4, 5, and 6, which read as follows:

"3. That the respondent Frank Elko made a substantial misrepresentation with reference to the Sipusich transaction injurious to the seller, contrary to sec. 136.08 (2) (b), Wis. Stats.

"4. That the respondent Frank Elko by his acts and representations as found herein has demonstrated untrustworthiness to act as a real-estate salesman in such manner as to safeguard the interests of the public, contrary to sec. 136.08 (2) (i), Wis. Stats.

"5. That the respondent Frank Elko by his acts and representations as found herein has engaged in conduct in the Sipusich transaction which constitutes improper dealing, contrary to sec. 136.08 (2) (k), Wis. Stats.

"6. That the respondent Elko acted for more than one party in the Sipusich transaction without the knowledge of the Sipusichs, contrary to sec. 136.08 (2) (e), Wis. Stats."

The various subsections of sec. 136.08 (2), Stats., enumerate the grounds for suspension or revocation of a real-estate broker's or salesman's license. The four material paragraphs thereof are (b), (e), (i), and (k), providing as follows:

"(b) Made any substantial misrepresentation with reference to a transaction injurious to a seller or purchaser wherein he acts as agent;

"(e) Acted for more than one party in a transaction without the knowledge of all parties for whom he acts;

"(i) Demonstrated untrustworthiness or incompetency to act as a broker or salesman in such manner as to safeguard the interests of the public;

"(k) Been guilty of any other conduct, whether of the same or a different character from that specified herein, which constitutes improper, fraudulent, or dishonest dealing; or"

Inasmuch as we have determined that there is no competent evidence of any actual misrepresentation on the part of Elko, conclusion of law No. 3 cannot be permitted to stand. We also hold that conclusion of law No. 5 should be deleted as we find no occasion for the board to have resorted to the "catchall" provision of sec. 136.08 (2) (k), Stats., in view of conclusion of law No. 4 determining that sec. 136.08 (2) (i) had been violated. The words *"and representations"* in conclusion of law No. 4 should also be deleted. We are permitting conclusion of law No. 6 to stand, not because we believe Elko intentionally failed to disclose to the Sipusichs that Nolan was an employee of the company, but because Elko failed to make certain that his explanation of such fact was understood by either Mr. or Mrs. Sipusich.

A real-estate broker owes the duty of a fiduciary to the property owner for whom he acts as agent. *Rattray v. Scudder* (1946), 28 Cal. (2d) 214, 169 Pac. (2d) 371, 164 A. L. R. 1356; *Berenson v. Nirenstein* (1950), 326 Mass. 285, 93 N. E. (2d) 610; *Mackey v. Baker* (1950), 327 Mich. 57, 41 N. W. (2d) 331; 8 Am. Jur., Brokers, p. 1035, sec. 86; and 12 C. J. S., Brokers, p. 11, sec. 6. In *Werner v. Leser* (1928), 195 Wis. 99, 217 N. W. 650, this court held that the broker in that case was not a fiduciary because of the peculiar nature of the brokerage contract, thus in effect invoking an exception to the general rule that a real-estate broker does act in a fiduciary capacity. We deem that the general rule and not the exception governs the instant cases. Elko's conduct in the Sipusich transaction fell far short of measuring up to the standard required of a fiduciary.

Both the Goldman and Nolan offers to purchase are highly unusual, and extremely disadvantageous to the Sipusichs. The unusual feature of these offers consists of the fact that the purchaser is not required to invest a cent of his own

money as down payment, but is permitted to mortgage the sellers' property in order to acquire the money for the down payment. Winzenburg testified that, since his representation of the Wauwatosa Realty Company in 1946, he had closed in excess of 10,300 real-estate transactions, but had never handled a deal comparable to the Nolan offer to purchase. Horning, president of the company, also testified that the company had never before handled such type of a real-estate deal. On the other hand, Goldman in his testimony claimed that such type of a purchase arrangement is "quite usual" in downgrade areas in Milwaukee. However, it is apparent that Goldman in so testifying was endeavoring to justify his own offer, while Winzenburg and Horning, in admitting the unusualness of such an offer, were in reality testifying against their own interest. Therefore, their testimony in this respect is entitled to great weight.

In spite of the highly disadvantageous nature of the Goldman and Nolan offers to the Sipusichs, Elko failed to point this out to them. Winzenburg testified that the company's salesmen were under instructions to point out to the owners of property, which had been listed for sale with the company, the advantages and disadvantages of any offer to purchase submitted. The fiduciary relationship which exists between a real-estate broker and his principal requires that this be done even in the absence of such instructions. On this point, the following statement made by the Kentucky court in *Smith v. Fidelity & Columbia Trust Co.* (1928), 227 Ky. 120, 122, 12 S. W. (2d) 276, is deemed to be pertinent:

"It is the duty of a broker to exert his best efforts and to exercise his best judgment for the benefit of his principal. Like any other agent for pay, it is the broker's duty to advise his principal fully of all the facts within his knowledge affecting the matter in hand reasonably calculated to influence his judgment, and to make an honest and diligent effort to accomplish the purpose of the agency."

Sipusich had previously advised Elko that he was not interested in taking back a second mortgage. It was Elko's duty to have advised Sipusich that the land-contract feature of the Goldman and Nolan offers, which subordinated the Sipusichs' equity, as owners, to the lien of a mortgage, from Sipusich's standpoint did not differ from the second-mortgage proposal which he had rejected. The fact, that Elko failed to advise the Sipusichs of the disadvantages of the Goldman offer, provides no justification for his similar failure with respect to the Nolan offer.

Elko's conduct in procuring the execution of the warranty deed from the Sipusichs to the Nolans, and then delivering the same to Nolan after promising them that he would not do so, is particularly subject to censure. In so doing Elko was deliberately acting contrary to the interests of the Sipusichs in order to favor Nolan. Elko should have known that protection of the Sipusichs' interests required that the execution of the deed by the Sipusichs to the Nolans, the execution of the mortgage by the Nolans, and the deed back to the Sipusichs by the Nolans, be done practically simultaneously at one sitting. Elko also must have known that the execution of any deed by the Sipusichs constituted part of the closing, and that Winzenburg had issued instructions that he personally handle such closing.

Because of our determination that certain findings of fact by the board, in which Elko was found to have made misrepresentations to the Sipusichs, are not supported by substantial evidence, the order of the board revoking Elko's real-estate salesman's license was properly reversed by judgment of the trial court. However, it was error for such judgment to have dismissed the proceedings, and to have set aside all of the findings of fact. Because certain of the findings of fact as to Elko are supported by substantial evidence, it is necessary that the board's proceeding as to Elko be remanded to it for further action. Upon such remand it

will be for the board to exercise its discretion in determining the extent of the discipline to be exacted against Elko, after eliminating from consideration those findings of fact and conclusions of law which this court has herein determined to be erroneous.

The contention is advanced in behalf of one of the other respondents whose license was suspended, and not revoked, that the board has no statutory power to so suspend a license as the final discipline to be invoked against an offending broker or salesman. In support of such contention it is argued that suspension is only to be used by the board as a temporary measure pending completion of the disciplinary proceeding. We find no merit in this contention and hold that suspension of license, as well as revocation thereof, may be employed by the board as the final discipline to be invoked against an offending licensed broker or salesman.

### Kenneth R. Nolan (Case No. 217).

We determine that there is substantial evidence to sustain the board's findings of fact made with respect to the respondent Nolan. It lay within the province of the board to disbelieve any or all of Nolan's testimony not corroborated by the testimony of some disinterested witness or by undisputed documentary evidence. Facts adduced in evidence, from which the board drew reasonable inferences, constitute substantial evidence to support findings of fact based on such inferences.

The particular findings of fact of the board relating to Nolan, in addition to Nos. 14 and 26 which have previously been set forth herein, are as follows:

"25. That respondent Nolan knowingly delivered this deed to his attorney Albert F. [R.] Franz contrary to his precise testimony.

"27. That respondent Nolan disregarded the specific instructions and duty imposed upon him by the respondent

company and respondent Winzenburg in refusing and neglecting to promptly return the deed and abstract to the Sipusichs' attorney, one J. Kaiman."

The only two conclusions of law entered by the board with respect to Nolan read as follows:

"7. That the respondent Nolan by his acts and representations as found herein has demonstrated untrustworthiness to act as a broker and as a salesman in such manner as to safeguard the interests of the public, contrary to sec. 136.08 (2) (i), Wis. Stats.

"8. That the respondent Nolan by his acts and representations as found herein has engaged in conduct in the Sipusich transaction which constitutes improper dealing, contrary to sec. 136.08 (2) (k), Wis. Stats."

We find two things seriously wrong with these conclusions of law. In the first place, there is no evidence of Nolan having made any *"representations"* to anyone. Finding No. 25 finds that he gave false testimony at the hearing. However, he was not charged with this offense, and could not have been prior to the hearing, and has had no advance notice of such a charge. He, therefore, is not subject to discipline by the board for this in the instant proceeding. Therefore, the words *"and representations"* must be deleted from conclusion of law No. 7. Secondly, sec. 136.08 (2) (k), Stats., covers fraudulent or dishonest dealing, and the board's findings of fact do not support such a determination. Therefore, conclusion of law No. 8 must be deleted. In so far as Nolan's handling of the warranty deed constituted improper conduct, such conduct is covered by sec. 136.08 (2) (i).

This court is unable to determine whether the board's revocation of Nolan's real-estate broker's and salesman's licenses was at least in part erroneously based on conclusion of law No. 8, or the finding that he gave false testimony at the hearing. Therefore, the judgment of the trial court in Nolan's case will be reversed, and the court directed to re-

mand the proceedings, in so far as they affect Nolan, to the board for further action not inconsistent with this opinion.

*Edward Sisolak (Case No. 219).*

The board's findings of fact with respect to the respondent Sisolak are as follows:

"18. That the respondent Elko [Sisolak] did not explain the deed or the transaction, before taking the acknowledgment, to the Sipusichs in Czecho-Slovakian but only said a few words in Czecho-Slovakian, contrary to his precise testimony.

"19. That the respondent Sisolak was not present when the deed was signed by the Sipusichs but came later and took the acknowledgment contrary to his precise testimony."

The board conceded at the hearing in circuit court that the name "Elko" appearing in finding of fact No. 18 was an error because Sisolak was the person intended to be named therein. Counsel for the board sought permission of the circuit court to amend such finding to correct this obvious error, but the circuit court properly denied such application. Even so, if finding No. 18 were deemed to be so amended, there is no substantial evidence to support such finding. Sipusich's testimony was to the effect that he did not understand that which was said to him in the Czecho-Slovak language by Sisolak. Furthermore, we find nothing improbable in Sisolak's testimony that should cause anyone to doubt the truth thereof.

It is a wholly immaterial detail as to whether Sisolak was present when the Sipusichs signed the deed, or whether he arrived later and then took their acknowledgment. There is no question but that the acknowledgment was taken legally. While Sipusich testified one way on this point of when Sisolak arrived, and Elko and Sisolak the other, there is no apparent motive for Sisolak to have testified falsely with respect thereto.

The only conclusion of law entered by the board, which relates to Sisolak, is conclusion of law No. 1, reading as follows:

"That the respondent Edward Sisolak by his representations as found herein has demonstrated untrustworthiness to act as a broker and as a salesman in such manner as to safeguard the interests of the public, contrary to sec. 136.08 (2) (i), Wis. Stats."

In passing on the case of Nolan, we have stated the reasons why he could not be disciplined in the instant proceeding for false testimony given at the hearing. The same reasons apply equally to Sisolak. However, we do not wish to be understood that we even imply that Sisolak knowingly gave any false testimony, because we do not believe that he did.

The judgment of the circuit court in Sisolak's case will be affirmed.

*Clement Winzenburg (Case No. 220).*

The board's findings of fact with respect to the respondent Winzenburg are as follows:

"28. That the respondent Winzenburg and respondent company and its officers did not return the deed for approximately fourteen days.

"29. That some of the documents requested by Mr. J. Kaiman were not returned to the Sipusichs until approximately two weeks after the original request.

"30. That the respondent Winzenburg advised J. Kaiman that he did not have authority to cancel the listing contract when actually he did have such authority.

"31. That the listing contract was never canceled by the respondent realty company."

The following are the board's conclusions of law based on the foregoing findings, and presumably also on the findings made with respect to Elko:

"9. That the respondent Winzenburg by executing the procedures promulgated by the president of the respondent company was not relieved of his responsibility to Sipusichs.

"10. That the failure of the respondent Winzenburg as a broker and company officer to act to safeguard the interest of Sipusich as found herein exhibits a failure to understand the obligation between principal and agent as required by sec. 136.05 (2) (b), Wis. Stats., and contrary to sec. 136.08 (2) (i), Wis. Stats.

"11. That the respondent Winzenburg as a broker and company officer recognized this transaction as highly unusual and questionable and failed to properly instruct and supervise his agents so as to safeguard the interests of the Sipusichs as found herein, has demonstrated incompetency to act as a broker in such manner as to safeguard the interests of the public contrary to sec. 136.08 (2) (i), Wis. Stats.

"12. That the failure of the respondent Winzenburg to act to safeguard the interest of Sipusich as found herein constitutes improper dealing, contrary to sec. 136.08 (2) (k), Wis. Stats.

"13. That the respondent Winzenburg was under a duty to Sipusich to have the Nolan offer fully and fairly presented to Sipusich.

"That the respondent Winzenburg failed to discharge this duty to Sipusich.

"14. That the respondent Winzenburg was under a duty to Sipusich to have the transaction promptly rescinded and immediate restitution made to Sipusich of his property."

It is apparent from reading the foregoing conclusions of law that they are partly in the nature of findings of fact.

We find no basis of fact whatever for the board's conclusion that Winzenburg failed to take proper steps to protect the interests of the Sipusichs, either before or after the submission by Elko of the Nolan offer of purchase, or that he was derelict in not taking prompt steps to rescind the Nolan deal. Winzenburg's office was at the company headquarters while Elko and Nolan worked out of one of the company's outlying offices of which Mott was the manager. Winzenburg

was responsible for a company rule that, if any salesman of the company should submit an offer to purchase a property listed with the company for sale, the fact that he was a company employee must be stated in the written offer to purchase. When Mott consulted Winzenburg by telephone with respect to Nolan submitting the offer to purchase to the Sipusichs, Winzenburg authorized the submission of the offer only on the condition that the sellers have a right to rescind the deal if they did not understand it. To make sure that the Sipusichs were accorded this protection, Winzenburg further instructed Mott and Elko that the deal must be routed to Winzenburg for closing. The purpose of this latter instruction was to enable Winzenburg to point out the disadvantageous nature of the deal to the Sipusichs so that they could exercise their option to cancel if they so desired. It was because Winzenburg disapproved of the deal that he took these special precautions.

A real-estate broker, with whom an owner has listed property for sale, is duty bound to communicate all offers of purchase to his principal, unless the principal has issued specific instructions relieving the broker of such duty. The broker must do this even though in his judgment the offer is so disadvantageous to the owner that the latter would be unwise to accept it. This duty of communicating such an offer extends to one submitted by the broker's own employee or salesman, but in such case full disclosure of such relationship is also required. Therefore, there was no breach of the fiduciary relationship, which exists between broker and principal, in authorizing the submission of the Nolan offer under the special precautions taken by Winzenburg to protect the owners.

Winzenburg's letter to Kaiman of June 4, 1956, which has been previously set forth verbatim herein, accorded the Sipusichs the absolute and unconditional right to cancel. At the time of writing such letter, Winzenburg had not yet

learned of the obtaining of the deed. When he did learn of such fact on June 7th, he immediately mutilated and voided it so as to put it without Nolan's power to use the same. We attach no significance to the fact that the accepted offer to purchase, abstract, and deed were not physically returned to the Sipusichs until June 19th. There is not the slightest indication that such delay was occasioned by any ulterior purpose on Winzenburg's part. The record does not warrant an inference to the contrary.

Finding of fact No. 30 finds that Winzenburg made a false statement in his letter of June 7, 1956, to Kaiman. The exact wording of such statement is as follows: "Respecting your request for the return of the listing, I do not know the terms of it (expiration date, etc.), and further it is not for me to make the determination when the return of a listing is requested." The testimony of Winzenburg at the hearing, upon which the board apparently relied in finding such statement to be untrue is, "I might join in making the determination [as to whether the listing contract should be canceled], but I wanted to talk to Mr. Mott and the salesmen in regard to it." We are unable to attach the sinister significance to this incident that the board did. In any event, it relates to a comparatively collateral issue, and, standing alone, would not support the suspension of Winzenburg's broker's license.

Finding of fact No. 31 is contrary to the evidence. The listing contract was returned to the Sipusichs pursuant to request, and this in law effected a cancellation thereof.

The judgment of the circuit court in this case, which set aside the board's order suspending Winzenburg's broker's license and dismissed the proceedings as to him, will be affirmed.

*John A. Horning (Case No. 249).*

The board in its findings of fact specifically found that the respondent Horning did not have any knowledge of the

Nolan-Sipusich transaction until about June 22, 1956. The order suspending his real-estate broker's license for thirty days is grounded upon the provisions of sec. 136.07 (3), Stats., which reads as follows:

"Each broker shall be responsible for the acts of any and all of his salesmen while acting as his agents."

Counsel for Horning contend that this statute only imposes civil liability upon a broker for the acts of his salesmen, and has no application to disciplinary proceedings instituted under sec. 136.08 (2), Stats. If such be the objective of the statute, it is wholly superfluous because it would be merely restating the common law. It is not to be presumed that the legislature has performed a useless task by enacting such a superfluous measure. Furthermore, the only available legislative history negatives the contention advanced by counsel.

Both secs. 136.07 (3) and 136.08 (2), Stats., had their origin in ch. 231, Laws of 1929, present sec. 136.08 (2) being therein numbered sec. 136.08 (1). Senator Irving P. Mehigan was the author of Bill No. 195, S., introduced in the 1929 session of the legislature, which was enacted into such ch. 231. Correspondence has been preserved in the legislative reference library, which passed between Senator Mehigan and Edwin Witte, legislative librarian, while such bill was in the drafting stage. Such correspondence clearly discloses that the provision which became sec. 136.07 (3) was intended to apply to suspension of real-estate brokers' licenses.

The difficulty with basing the suspension of Horning's broker's license on sec. 136.07 (3), Stats., is that Elko and Nolan were not employed by him as his salesmen, but by the Wauwatosa Realty Company, a corporation. We deem the fact that Horning is the sole beneficial owner of the capital stock of the company to be immaterial to this issue. No reason of public policy has been advanced which would jus-

tify the expedient of piercing the corporate veil in the instant proceeding where there was neither participation in the wrongdoing nor any laxity of supervision traceable to Horning. The company possessed its own broker's license, but the board in the exercise of its discretion did not see fit to suspend it because of the acts of its salesmen Elko and Nolan.

The judgment of the circuit court setting aside the order suspending Horning's license and dismissing the proceedings will be affirmed.

*By the Court.*—The judgments in cases Nos. 219, 220, and 249 are affirmed. The judgments in cases Nos. 217 and 218 are reversed, with directions that the proceedings of the board, in so far as they relate to the respondents Nolan and Elko, be remanded to the board for the purpose of redetermining the discipline to be imposed on said two respondents after elimination of those findings of fact and conclusions of law which have been disapproved of in this opinion. No costs shall be taxed on these appeals.